# Richmond.

## Roy C. Flannagan, Administrator, etc. v. The Northwestern Mutual Life Insurance Company.

January 17, 1929.

Absent, Chichester, J.

The opinion states the case.

*Sands, Williams & Lightfoot*, for the plaintiff in error.

*Hunton, Williams, Anderson & Gay*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is an action of trespass on the case in assumpsit, brought on two life insurance policies issued by the

defendant company to decedent, William L. Jones At its trial there was a verdict for the plaintiff, which was set aside by the court and final judgment entered for the defendant.

On November 10, 1924, William L. Jones, at Maywood, Illinois, applied to the defendant for insurance in the sum of $5,000.00. On December 10, 1924, he was examined by the company's physician and on December 15, 1924, the policy issued.

On December 22, 1924, he applied for a five year term policy of $5,000.00. It issued as of December 22, 1924. This afterwards, at his request, was changed to an ordinary life policy. There was no medical examination made while the application for it was pending. The applicant did sign what is called a "Personal Certificate," certifying that there had been no change in his health since the first examination. To this second policy a photostatic copy of the first medical examination was attached which by the terms of the policy itself was made a part of it.

On November 26, 1925, Mr. Jones died in King and Queen county, Virginia, from the effect of gunshot wounds.

█ It may be well to consider *in limine* the claim made in plaintiff's tenth assignment of error, which is that these two policies, so far as the medical examination is concerned, and the answers there made, stand upon different footings, and that if, by any chance, the first should be set aside because of misstatements, such defense would not apply to the second, for when it was issued no examination was had at all.

The first policy, as we have seen, is dated December 15, 1924. A week later the insured applied for another. It was not deemed necessary to make any re-examination. Mr. Jones said that his health was still good,

and to the policy, when issued, was attached a copy of his first examination made while the application for it was pending. This attached copy is made a part of the second policy and it with the attachment was delivered to and accepted by Jones. There is no merit in this assignment.

■ The case, as we shall see, turns upon the action of the trial court in setting aside the jury's verdict and in entering final judgment, *non obstante*, for the defendant. This was done under section 6251 of the Code of 1919.

Before the Code of 1919 was enacted, section 3484, Pollard's Code, 1904, provided that "the rule of decision in the appellate court in considering the evidence in the case" was, with certain exceptions, "as on a demurrer to the evidence by the appellant."

While that was still the law, Judge Cardwell, in *Cardwell v. Norfolk & W. Ry. Co.*, 114 Va. 500, 77 S. E. 612, said: "It would, indeed, be a futile and idle thing for the law to give to a court supervisory authority over the proceedings and the manner of conducting a cause before the jury, and the right to set aside the verdict of the jury therein because contrary to the evidence unless the judge vested with such power could consider to some extent at least the evidence in the cause."

Section 3484 of Pollard's Code appeared in the Code of 1919 as section 6363. It is there said that "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Section 6251 deals with the power of trial courts, and came before this court for construction in the leading case of *Forbes & Co. v. Southern Cotton Oil Co.*, 130 Va. 245, 108 S. E. 15. There the verdict of the jury was set

aside by the trial court which entered final judgment for the defendant. In other words, the same state of facts confronted this court there that confronts it here. It was held, in substance, that the power of the trial judge had not been extended and that it took the case practically as on a demurrer to the evidence.

That opinion and statute were carefully considered by Mr. Thomas J. Michie, Jr., in an article in 8 Va. Law Reg. (N. S.), 808. He reached the conclusion that such cases should not be taken as formerly on a demurrer to the evidence, and that the trial court which saw and heard the witnesses had greater power over a verdict than it theretofore had on demurrer.

In *Davis* v. *McCall*, 133 Va. 487, 113 S. E. 835, Judge Burks again had occasion to consider these two statutes. He said that section 6363, when read in connection with section 6251, plainly refers to judgments in support of verdicts, and should be so construed. He then goes on to observe: "In a great majority of instances, cases at law arising under section 6363 of the Code are still to. be heard by. this court practically as on a demurrer to the evidence by the plaintiff in error, but exceptional cases may arise where a strict and technical enforcement of that rule would work injustice, and in those cases some latitude is allowed to this court." In that case the verdict of the jury was confirmed by the trial judge.

In *Norfolk & Western Ry. Co.* v. *T. W. Thayer Co.*, 137 Va. 294, 119 S. E. 107, the verdict of the jury was also confirmed by the trial judge. Judge Burks there said: "Trial courts have no greater power over verdicts now than they had before the enactment of the Code (see section 6251), nor has this court, but this court has always exercised the power and the duty, when not hampered by statute, of setting aside a judg-

ment that was plainly wrong or without evidence to support it. See *Chapman* v. *Va. Real Estate Co.*, 96 Va. 177, 31 S. E. 74, and other cases cited in notes to Code, section 6363.''

In *Vandenbergh & Hitch, Inc.* v. *Buckingham Apartment Corp.*, 142 Va. 397, 128 S. E. 561, he reached the conclusion that occasions might arise in which the rule applicable to a demurrer to the evidence should not be applied, as appears from this statement: ''Perhaps on a demurrer to the evidence by the defendant, we might be compelled to accept Vandenbergh's statement of the waiver by Johnson, but not so under our present statute (Code, sections 6251 and 6363), when to do so would strain the credulity of the court to the breaking point, and require the entry of a judgment contradicted by every other fact and circumstance of the case in conflict with the testimony of numerous witnesses of high character, and manifestly against right and justice. It is extreme cases of this sort that the statute was enacted to meet.''

Judge Campbell, in *Veale* v. *Va. Railway & Power Co.*, 144 Va. 210, 131 S. E. 200, was of opinion that this freedom of action was right and proper. See also *Meade* v. *Saunders*, 151 Va. 636, 144 S. E. 711.

Prentis, C. J., in the recent case of *White* v. *Southern Ry. Co.*, 151 Va. 302, 144 S. E. 424, states his views on this subject to be: ''Substantial conflicts in testimony must be submitted to a jury, but where there is no real conflict, juries should decide questions of fact in accordance with the testimony submitted.'' It is difficult to frame a more workable rule than this.

Broadly speaking, section 6363 of the Code deals with the power of the appellate court, section 6251 with the power of trial courts. If the demurrer rule does not in strictness apply to this court, then for a

stronger reason it should not apply to the court below. A judge who saw and heard the witness can weigh his evidence more understandingly than can a court which takes it upon the printed record. Certainly his judgment is worth something, and the same reasoning gives to a verdict approved weight which does not attach to one which comes to us stamped with the disapproval of the trial judge.

█ In the case in judgment certain facts are admittedly established. As to them there is no conflict at all.

Defendant had been with the American Can Company since its organization in 1901. In 1918, he had attained a position as superintendent of its Baltimore factory at a salary of $5,500.00 a year. In October or November of that year he was transferred by his company to a like position in Kansas City. After he had been there about a month he contracted what seems to have been a rather severe case of influenza and was confined to his room for about three weeks. His recovery was not complete; he was relieved from duty and sent back to Baltimore. On that occasion he asked for time to recuperate and was given and took about three weeks vacation, after which he resumed his old work there. Early in 1920, his duties were enlarged; he was made division superintendent and placed in charge of four of his company's factories. In that year some nervousness appeared, and at the suggestion of Dr. Carroll, the company physician, he again took a vacation and went down to Chincoteague Island to rest. After being there for something like two weeks he returned to Baltimore. Later on his condition again became unsatisfactory and in the latter part of the spring of 1923, or in its early summer, he took another vacation of about six weeks, ending July 9th.

In July of that year his salary was increased to $6,000.-00. After his return in July, he continued to work in Baltimore until October, 1924, when he was sent to Maywood, Illinois, at a salary of $10,000.00 a year to take charge of an important factory. By March, 1925, trouble came again. He was relieved from duty and went to a cure at West Baden, Indiana. After his return from that sanatorium, he did some light work for his company, but never again undertook any major duties. That company was of opinion that he was not physically able to carry on, and after conference reached the conclusion that he should be retired. He was retired and placed upon a pension which would have begun to run from December 1, 1925. He died before that date, on November 26, 1925.

The policies each contain provisions against suicide within the year, and further stipulate that they are incontestable after one year from their date of issue if the insured was then living and otherwise after two years. To each of them is attached a copy of the examination, containing among other things these questions and answers:

"10. A. When were you last confined to the house by illness? How long? What nature?

"A. 1918. Three weeks. Influenza.

"B. When did you last consult a physician and for what?

"B. As in A.

"C. Have you fully recovered and are you now in good health?

"C. Yes.

"D. Give name and address of physician who attended you.

"D. Dr. in Kansas City. Do not know name.

"E. Give name and address of your usual medical attendant.

"E. Dr. C. J. Carroll, Baltimore, Md.

"F. Are you willing that your physician be consulted in regard to your health?

"F. Yes.

"11. Have you had any illness, disease or accident during past ten years not mentioned above? Yes. Give details.

"Illness, disease or accident, fractured rib. Date, 1919. Duration, few days. Severity, moderate. Results, recovered. Name of medical attendant, doctor in Kansas City.

"12. Have you had since childhood any of the following diseases or symptoms? (Each question must be read and answered 'Yes' or 'No.').

"Mental Derangement or any nervous disease? No."

That they are material, misleading and untrue is shown by the evidence, the defendant contends, beyond peradventure. This claim the plaintiff vigorously denies and in connection with his denial complains of the fact that the trial judge, who gave judgment for the defendant, did not set out in his order, or in a written opinion, those facts which he believed were uncontroverted and on which his judgment was based.

The issue thus made calls for an examination of that evidence in some detail. This is necessarily tedious but unavoidable. It is addressed to four periods of time, (1) 1918-19, (2) 1920, (3) 1922-23, and (4) 1924-25.

As we have already seen, Mr. Jones was sent to Kansas City in the autumn of 1918. Soon after his arrival he was stricken with influenza and was confined to his room for something like three weeks. John M. Young, assistant to the president of the American Can Company, is the only witness who had first hand information as to conditions there. He testified:

"Q. Did you personally see him while he was in Kansas City?

"A. Constantly.

"Q. What was his general physical condition then as you observed it?

"A. Good when he arrived in Kansas City, but after he had the flu he didn't recover rapidly and his physical condition was not good; not good enough to give us his best abilities in a factory that needed it.

"Q. How long did that continue?

"A. For the last two months that he was there, approximately.

"Q. Did your observation of him give you the opportunity of seeing him while he had any objective symptoms of any nervous disturbances at that time?

"A. I think his trouble was what is usually termed a kind of 'nervous breakdown.' He was strong enough but just nervous.

"Q. Nerves gone to pieces?

"A. Yes, that's what I would term it.

"Q. How did that nervous disturbance manifest itself to you?

"A. He would be more irritable, concentrate his mind less on his work, frequently stating that he wasn't feeling well—usually he was full of vitality and would be around the plant. He would stay more in the office; not be around the plant and what we term 'on the job.' "

This condition continued for about two months. Jones wanted to be transferred back to Baltimore. This was done, and at his request he was granted a leave of absence that he might recuperate. He was not confined to his bed in 1919, but went to the factory practically every day. He was relieved from duty, not because he was away from his post, but because,

in the language of this witness, he was not "on the job" when there.

There was no conflict of evidence as to this situation.

In the medical examination he stated that he was ill for three weeks with influenza in 1918, had fully recovered and was in good health.

We come next to his condition in 1920.

At the end of his leave of absence in 1919, he returned to Baltimore, apparently restored to health, and resumed his duties as superintendent of the factory there. In 1920, this nervous condition again became manifest. Dr. Carroll advised the company officials of the situation and recommended a vacation. His evidence is:

"Q. What was the nature of these talks you had with Mr. Jones?

"A. Well, first one official and then another of the American Can Company would visit Baltimore discussing the factory problems, and on some of these occasions I think I volunteered the information that Mr. Jones was in a highly nervous state and I thought he should have a vacation, and the substance of the reply was 'see that he gets it;' tell us what you want him to do and we will act with you and instruct him to carry it out. I don't remember the exact date but he went down in Virginia. He remained an uncertain length of time—3 or 4 weeks—on that occasion.

"Q. When was that?

"A. I cannot give you the exact date but we will say—Will you tell me when Mr. Jones left Baltimore?

"Q. It was about 1924.

"A. I would say somewhere around 1920 he went down to Chincoteague. After having a talk with the officials I suggested that Mr. Jones have a vacation.

"Q. And he had a vacation as the result of that talk?

"A. I don't know just when it was.

"Q. You say he had this nervous breakdown in the fall of 1922 or 1923, so that was some time after the trip you now speak of—so his nervous condition had existed since 1920?

"A. Somewhere around there. I think that was about the time when it first began to be apparent.

"Q. Did Jones consult you about that—how did you happen to advise the officials of the company?

"A. I was down to the American Can plant and during the course of our casual conversations down there—not any one conversation but several—these facts came up.

"Q. You advised Mr. Jones that he should go away for his health?

"A. Yes; a change—a vacation."

There is no conflict here.

From this vacation he returned to Baltimore apparently in good health and took up his duties there again.

We come now to the situation in 1922-23. Dr. Carroll has testified at length on this subject. He said:

"Q. Did Mr. Jones appear to you in the latter part of 1922, or early in 1923, to be in a highly nervous, wrought up condition?

"A. Yes; he was.

"Q. Was his condition such as might be fairly described in a simple expression of 'going to pieces'?

"A. Well, I think a fair description would be to say that he was quite nervous.

"Q. What objective symptoms of nervousness did you notice he displayed?

"A. Objective—I don't remember whether there were very many, if any—there were no objectives.

"Q. What subjective?

"A. He said that he was nervous; did not sleep so well, and described to me some conditions that might be the underlying cause.

"Q. What were those reasons?

"A. Some of them were financial reverses. He had invested some money with the firm of Smith, Lockhardt and Company, in Baltimore, that failed and I think he told me he had about $11,000 loss by that. There were some other things that came to me in a private nature that I feel I have no right to describe in detail. They were, I might say, for purposes of your inquiry, that they had no relations to liquor.

"Q. Why did he come to you at that time?

"A. I don't know. Mr. Jones and I were very good friends; that is, I would meet him in the factory, not in a social way, and perhaps meeting him in the factory, and discussing factory problems with him, I gradually gained his confidence and then he gradually came to me from time to time and would speak to me about a cold, or headache, or something else."

 * * * * * *

"Q. What was this condition, if you are reluctant to state the cause, tell us more fully what the condition was as the result of that cause?

"A. He was a nervous man, quite beside himself so to speak; could not sleep and whereas he reported every day for business at his office, he could not give the attention to his other business that it probably should have.

"Q. Did he tell you that?

"A. Yes.

"Q. Did he give any other conditions that had been produced by his upset state of mind?

"A. Only the nerves that I referred to.

"Q. Could not sleep?

"A. Went 'all to pieces' in a way.

"Q. Well that is the phrase I used a while ago—that he had gone to pieces?

"A. Yes.

"Q. That is a fair statement of condition?

"A. It was of short duration but very severe while it lasted."

At another point in his evidence this witness said:

"Q. His condition had gotton so acute in the fall of 1922 or early spring of 1923 that you thought him going all to pieces and needed a rest?

"A. I think that 'all to pieces' statement of yours covers a multitude of sins. It is too comprehensive for practical understanding. Don't you understand that, so far as I know, with the single exception of when he had this attack of chigoes and his crack in the nose, he had not lost a day from business. Mr. Jones exhibited his nerves to those friends who know him fairly well in the form of being irritable, perhaps that was the objective symptom he had. Ordinarily, Mr. Jones was an affable man, beloved by every one, so far as I knew."

During this time Jones came to Dr. Carroll's office about four times for consultation. He was examined, but rather superficially, and the doctor does not appear to have regarded his condition as particularly serious. He did think that a vacation was necessary and advised it. At its end Jones told him how it had been, in part, spent:

"Q. Did you tell Mr. Harris, at the interview you had with him in your office in March, 1926, that Mr. Jones went to a sanitarium located in the city of Brooklyn in the Flatbush district?

"A. I would not say that I did and I would not say that I didn't. I know that he went up there and consulted some friends in New York.

"Q. How do you know that?

"A. He told me afterwards that he was under treatment by some nerve specialist.

"Q. Who was that?

"A. I don't know.

"Q. Where?

"A. Somewhere in New York.

"Q. Did he tell you that?

"A. Yes.

"Q. That was after he left here in January, 1923?

"A. That was after he came back.

"Q. After he came back from this rest?

"A. Yes.

"Q. How long was he away?

"A. I could not say for sure—about two months.

"Q. When he came back he told you he was taking treatment from a nerve specialist?

"A. He was under the care of a nerve specialist and being treated for nervous trouble."

This evidence, fairly construed, tells us that Jones was threatened with a nervous breakdown and on the advice of his friend and physician took a vacation. He went to New York, placed himself under the care of a nerve specialist and was treated for nervous trouble. That he did so spend a part of this vacation is nowhere questioned in the record.

W. H. Krebs was district sales manager for the can company. He was asked:

"Q. Do you know whether Mr. Jones suffered a physical breakdown in the latter part of 1922 or the early part of 1923?

"A. He was very nervous, that was all I know," and stated that this condition continued for possibly a few months.

E. E. Caldwell was manufacturing superintendent of the can company. He said that Mr. Jones had been working under a strain and was in a more or less nervous condition, was wanting in self-control, lacked composure and that in his judgment this condition was due to something more than normal application to ordinary work.

Richard P. Dorsey was general agent of the Aetna Life Insurance Company, and wrote for Jones an accident policy. He was a social associate in 1922, and did not notice any symptons of nervousness.

John M. Young was assistant to the president of the American Can Company. This is his statement of how Jones' health in 1923 was regarded by his company, and what they did relative to it.

"A. He was in good health and good condition when he lost his money and that was, I think, in 1922; the spring or summer of 1922.

"Q. How did that affect him?

"A. Not much at first, but as I used to meet him at the plant he continued to harp on losing his money and that it was about all he had saved; but he was on the job and in good condition, as I can recall it, until sometime in 1923.

"Q. The spring of 1923?

"A. I think that's about the time, early part of 1923.

"Q. What was the general condition of his health at that time?

"A. Which time?

"Q. After he lost his money you speak of in the spring of 1923?

"A. About that time I went to Baltimore and I didn't think that Jones was full of vitality on his job, and when I returned I spoke to Mr. Anderson and asked him to check up on Jones and see if he was tending his job right.

"Q. Do you know whether such a check was made?

"A. I do.

"Q. What was the result?

"A. The result was we decided that Jones was not in fit condition to tend his job, and being a member of the manufacturing committee I know that we told (Mr. Anderson was the man, I think) to have Jones take a vacation and get his health back; that he was no good on the job as he was.

"Q. What are Mr. Anderson's initials?

"A. Mr. T. M. Anderson, who is a member of the manufacturing committee directly in charge of packers' cans.

"Q. What symptons of any disorder did Mr. Jones display to you that made you feel his condition should be investigated?

"A. About the same condition that I saw him in at Kansas City; very nervous, irritable, lacking energy that would allow him to go out through the plant and watch the work of his men; spending too much of his time in the office.

"Q. Do you know whether your company's doctor there in Baltimore was directed to make an examination of him?

"A. I do not."

George L. Spence was district superintendent for the American Can Company. He said that he knew nothing about Jones' nervous condition in 1923, at the time, but heard of it afterward.

Walden L. Laskey was assistant general manager of manufacture. He was in Baltimore in 1922. At that time Jones seemed to be worried about the loss of his money, about some domestic affairs, and tired, but not seriously out of sorts.

Thomas N. Anderson was a member of the manufacturing committee. This is his statement of Jones' condition in 1923:

"Q. State again, Mr. Anderson, just what condition you found Mr. Jones to be in at that time?

"A. His condition was not serious. The main thing I noticed about him was thorough discouragement. He didn't have his usual punch and vim, and I gathered from the conversation that one of the reasons for his condition was the loss of all the money he had accumulated through the failure of a brokerage concern in Baltimore.

"Q. Did you know that Mr. Jones had consulted the company's physician, Dr. C. J. Carroll, at or about the time of your visit in April, 1923?

"A. No sir.

"Q. Would you say that as you observed him you found him highly nervous?

"A. I don't think so.

"Q. Would you say you found him irritable or fidgety?

"A. No. The most I would say of his condition, as I remember it, was that he had simply lost his vitality or his general interest, and he acted to me like a very discouraged man and, as reported to the committee on my return, I connected it more with the loss of everything he had than anything else."

At another point in his evidence he said: "He seemed thoroughly discouraged and dejected, which was very unlike him; and after conversation agreed that he should take immediate leave of absence. According to my recollection, he was away a few weeks, returned to his old duties in good shape and was his usual self until approximately October 1924."

W. E. Taylor was general manager of manufacture. He said that he had never heard the word "nerves" mentioned in connection with Mr. Jones.

John A. Rhule was traveling auditor for the can company. He saw nothing that indicated a nervous breakdown. Mrs. Flannagan, his sister, knew nothing about a nervous breakdown. Dr. Flannagan, his brother-in-law, never heard of it.

The record is quite large. and it is not possible to state all of the testimony bearing upon this phase of the case. We think it shows beyond any serious controversy that Jones was troubled with some form of nervousness in the latter part of 1922, and in the early part of 1923. He consulted Dr. Carroll about it, certainly as often as four times, and was examined by him. Due to the friendly relation between these gentlemen, these conferences were not very formal and the examinations were not very thorough, but the situation was sufficiently serious to warrant the officers of the company, in whose province this matter fell, in their conclusion that he was not able to carry on his work with satisfaction. As a result of this he was given a vacation. He went to New York, consulted a nerve specialist, and was treated by him for some nervous disorder. Upon his return he appeared to be restored to health, and his salary was raised to $6,000.00

He continued in Baltimore until the fall of 1924. At that time it became necessary to send some competent man to take charge of the company's factory at Maywood, Illinois. Jones' name came up for consideration; his health was discussed; and as the result of all this he was finally selected and sent to Maywood at a salary of $10,000.00 a year.

He undertook the work with vigor and success, but early in 1925 his old trouble reappeared in so serious a

form that he was relieved from duty. He went to a sanatorium, returned, and for a while did some light work, but was finally definitely dropped, because of his want of health, from the company's employment and placed on the pension roll. About these facts also there can be no dispute.

Of course it is true that happenings in 1925, could not have been noted in any medical examination in 1924, but they are competent to explain the culmination of a situation which had steadily developed from 1919. It may well be that Mr. Jones did not believe that he was seriously ill, but he did know of these several breakdowns, and he did go to New York and place himself under the care of a nerve specialist. None of these facts were suggested in his examination, and he specifically stated, as his medical examination will show, that he had not consulted a physicial since 1918.

If it be conceded that the conferences with Dr. Carroll and the examinations which he made were, under *New York Life Ins. Co.* v. *Franklin*, 118 Va. 418, 87 S. E. 584, so casual and informal as not to amount to consultations, his treatment by the New York specialist still remains an inescapable fact.

It is said that applicant's answers in his medical examination were not in every instance recorded exactly as made. In all the history of life insurance, it is doubtful if any applicant said nothing to his examiner beyond what was actually written into his report, and if a failure to record everything that was said in *ipsissimis verbis* constitutes error, the door is opened wide.

It is true that the medical examiner is the agent of his company, and he and it are charged with information imparted to him in the scope of his employ-

ment *South Atlantic Life Ins. Co.* v. *Hurt,* 115 Va. 398, 79 S. E. 401; *Harrison* v. *Prov. Relief Ass'n,* 141 Va. 659, 126 S. E. 696, 40 A. L. R. 616. However, when answers are transcribed in good faith, and in substance as the examiner understood them, and when their correctness had been certified to by the applicant, they must be construed as written. If this were not true, then he might as well not sign his certificate at all. As Judge Chichester aptly observed in *Royal Insurance Co.* v. *Poole,* 148 Va. 363, 138 S. E. 487: "It was his duty to read the application which he signed, and he was charged with notice of what it contained."

Dr. Kerr was his medical examiner. His testimony is:

"Q. Now, I call your attention particularly to question 10 of this medical examination and report, and will ask you whether those questions, A, B, C, D, E, and F, were each propounded to him, and whether he answered them as they are there recorded?

"A. Each question was asked and was answered as recorded.

"Q. Was Question No. 11 propounded to him, and does the report show his answer to question 11 was given by him?

"A. Question No. 11 was asked and was answered as recorded.

"Q. Now I will ask you whether question No. 12 and each of the different questions under that question were propounded to Mr. Jones at the time of his examination.

"A. Each question was asked, and was answered as recorded.

"Q. I will ask you particularly if you remember whether he answered the question beginning: 'Have you had since childhood any of the following diseases

or symptoms of mental derangement or any nervous disease?' Was that question propounded to him, and did he answer as recorded?

"A. Each question was asked, and was answered as recorded.

"Q. There is an explanation to his answers to the question under 12, and I will ask you whether that correctly records his explanations given to you at the time?

"A. The exceptions, as noted below, in reference to the questions asked above, were written in accordance with the statements of the person being examined, of the applicant.

"Q. Did he at the time of answering any of those questions, particularly the questions in Divisions Nos. 10, 11 and 12, inform you that he had had nervous exhaustion or a nervous breakdown, or nervous illness, or nervous symptoms in 1919, which required him to take a leave of absence from his work?

"A. He did not.

"Q. Did he in answer to any of those questions inform you in any manner that he had had a similar nervous breakdown, nervous exhaustion, or nervous symptoms, which again required him to absent himself from his employment and to consult a doctor or doctors, and to take treatment in reference to his condition in 1923?

"A. He did not.

"Q. Did he mention the fact in answer to any of these questions, or at any time upon that examination, that in 1923, for nervous troubles, he had consulted Dr. Carroll, of Baltimore?

"A. He named Dr. C. J. Carroll, of Baltimore, Maryland, as his usual medical attendant.

"Q. Did he mention, in connection with those answers, or at any time upon that examination, that he had consulted a nerve specialist or any other doctor in New York City for his nervous condition?

"A. He did not.

"Q. Did he state upon that examination, in answer to those questions or otherwise, that he had consulted any doctor for any trouble since 1918 or 1919?

"A. He did not.

"Q. In answer to subdivision question B or 10, is the answer in his words, or what was his answer to that question?

"A. The note says 'As in A,' referring to the answer as to the last time he consulted a physician was for this illness which is recorded, in 1918, when he had the influenza for three weeks."

Dr. William Thorndike is the assistant medical director of the defendant company, and passed upon the application in judgment. He was asked:

"That in 1919 he had had nervous breakdown, nervous exhaustion, or nervous condition which interfered with his sleeping, prevented him from properly concentrating his mind on his work, caused him to frequently complain that he was not feeling well, caused him to be very nervous and irritable and changed him from one full of vitality and energy, when well, to one who neglected his work and which caused him to obtain a leave of absence from his work to recuperate; and in 1923, he had a similar nervous breakdown, nervous exhaustion, or nervous condition in which he became very nervous and irritable, lacked energy and neglected his work, and was very nervous so that he consulted a physician for his nervous condition, who prescribed the use of bromides to steady his nerves, and so that the officers of the company by whom he was

employed observed his condition and excused him from his work for a period of about three months so that he might recover his health, during which time he consulted physicians for his condition.

"A. From the history as brought out by this question I would have considered the man uninsurable.

"Q. What would be the general practice or usage of insurance companies if that information had been brought to their attention in lieu of the answers I have referred to?

"A. The probability is that the case would be rejected without further questioning.

"Q. What would have been the result if the insurer, that is the company, had been advised simply of the fact that he had been extremely nervous in 1923, which necessitated him to leave his work for a vacation in order to recuperate and which caused him to consult his physician for that condition?

"A. The practice would be to get a detailed history from the attending physician, with further facts from the applicant himself covering that history.

"Q. And then what would have been the general practice of the insurance company in determining the question?

"A. It would be the consideration of what the doctor reported.

"Q. State whether or not you mean by that that the insurer would determine its action by the facts found upon such an investigation?

"A. I do."

Such a risk is subnormal and the defendant company does not accept subnormal risks. Those companies which do usually require about thirty-three and one-third per cent. excess premium.

■ The statutory law applicable to this issue appears in section 4220 of the Code (Michie's, 1924): "All statements, declarations and descriptions in any application for a policy of insurance shall be deemed representations and not warranties, and no statement in such application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance, or be construed as a warranty, anything in the policy to the contrary notwithstanding, unless it be clearly proved that such answer or statement was material to the risk when assumed and was untrue."

In *Keeton* v. *Jefferson Standard Life Ins. Co.* (C. C. A.), 5 Fed. (2d) 183, the court in considering this statute said: "It goes without saying that the very basis of the contract is the condition of the man's health. No insurance company could last, no insurance company could exist, unless there was a careful medical examination of the applicant for insurance."

And again: "The policies contained a one-year noncontestable clause. Of course, before issuance of such policies, the condition of the health of the applicant was of prime importance, and where the policies became incontestable after a year, it was doubly so. Every consideration of right and justice would indicate that in such circumstances the utmost care should be observed in entering into a contract of insurance, and that only persons supposed to be in good health would be acceptable as risks. The applicant's history in respect to his health and medical treatment were most material, as bearing upon whether the insurance risk would be assumed; and at least the applicant should make full and frank explanation and answers to all inquiries throwing light upon his present and past state of health. Nothing could well be more important

than the fact of previous sickness and past medical treatment, as to which the applicant was best able to furnish correct information; and anything that tended to mislead, or indicated a purpose to conceal the real truth, would serve to invalidate a policy if procured by such misleading fraudulent conduct."

It may well be that there was no purpose to defraud but that is not the test.

"The Revisors were of opinion that if the answer or statement was material to the risk when assumed and was untrue, that no recovery should be had, but that if immaterial although false and fraudulently made that it should not bar recovery for the reason that such a statement could not have affected the risk, being immaterial to it. If the statement was material, although innocently made, of course no recovery should be allowed." (Revisors' Note, Code 1919, section 4220.)

This test was adopted by Judge Prentis in *Standard Accident Ins. Co.* v. *Walker*, 127 Va. 140, 102 S. E. 585: "A fair test of the materiality of a fact is found in the answer to the question, whether reasonably careful and intelligent men would have regarded the fact communicated at the time of effecting the insurance as substantially increasing the chances of the loss insured against so as to bring about a rejection of the risk or charging an increased premium."

██ Whether a representation is made and its terms are questions of fact for the jury, but when proven its materiality is a question for the court. *North River Ins. Co.* v. *Atkinson*, 137 Va. 313, 119 S. E. 46; *Toledo, St. L. & W. R. Co.* v. *Allen*, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513, decided January 10, 1928.

 The insured is not required to do more than to answer questions truthfully and as he understands

them, but he cannot be heard to say that he did not understand questions plain upon their face. We do not think there was anything misleading, ambiguous or confusing in this examination. Applicant was asked: "When did you last consult a physician and for what?" He answered: "As in A." In A he was asked when he was last confined to the house by illness. He answered: "In 1918." He was asked if he suffered from any nervous disease and he answered: "No."

No man of ordinary intelligence could misunderstand what was asked for and the conclusions to be drawn from the answers are likewise clear. Mr. Jones was a man of more than ordinary intelligence.

It is true that with the exceptions noted, Mr. Jones, from 1918 to the date of his death, seemed to be in good health and did his work to the satisfaction of his company. He was given important positions and was promoted from time to time, but it is also true that his answers did not reveal to the company a trouble which had reappeared from time to time and which seemed to him sufficiently important to warrant a trip to New York that he might consult a nerve specialist. This may not have been the only reason which took him to New York, but it was one of the reasons. It is also true that had the bare outline of this situation been revealed to the insurance company, it would either have rejected the risk out of hand, or would at least have made an independent examination. In any event the company was entitled to an opportunity to make such an examination, and the concealment of facts which would have put it on notice was a concealment of facts material to the risk.

Nor do we attach any importance to the contention that applicant was merely in a nervous condition and was affected by no nervous illness or disease.

Whatever he had incapacitated him for work in 1919. The trouble reappeared in 1920, and in the latter part of 1922, and in the early part of 1923 it again manifested itself in more aggravated form, and the recrudescence of this neurotic condition in 1925 led to his permanent retirement on a pension.

The jury by its verdict has found that the insured did not commit suicide, and by that verdict we are bound, but it is interesting to note the manner of his death. He was found resting against a bank with the top of his head blown off by a gunshot contact wound. He had on a sweater which was buttoned. There was no hole in it but when it was unbuttoned it then appeared that he also had been shot in his abdomen. This likewise was a contact gunshot wound. Dr. Aylett said that it was barely possible that both wounds were self-inflicted. It is certain that both were not accidentally inflicted, and so he either killed himself or was murdered. There is no circumstance shown in the record to indicate murder, unless it be the wounds themselves. Lying by him was a double barrel shot gun; one barrel had in it a loaded shell and the other an exploded one. And near the body another exploded shell was found, which, according to the evidence of a witness who had extended opportunities for observation, was fired by the plunger that fired the shell still in the gun by the body. How he was killed we shall never know, but these facts are sufficient to emphasize the necessity for full disclosure of recurrent nervous attacks, or of neurotic symptoms.

The remaining assignments deal with the admission and exclusion of evidence. So far as the verdict itself was concerned, it was for the plaintiff, and that should be enough for him; but when that verdict was set aside and when final judgment was

entered for the defendant, these rulings do become of moment, for it is fair to assume that the trial court in setting aside the verdict and in entering judgment acted upon that evidence which was before the jury. If, however, with all evidence improperly admitted excluded from consideration, and with all evidence improperly excluded considered, no other judgment could have been reached, the matter is at most but harmless error.

The second assignment deals with the testimony of the medical examiner. He was asked what was the general practice when certain disclosures were made to him during an examination. He answered that he did not know what the general practice was, but that he knew what he would do in such circumstances—he would follow up these disclosures and report the results of his investigation to his company. He did not say that he would have rejected the application. He had no power to reject it. He would have reported the facts to his company and he should have so reported them. There is no error here.

The next assignment of error is addressed to a hypothetical question propounded by defendant's counsel to Assistant Medical Director Dr. Thorndike. The substance of the objection is that this question does not state all the facts in the case and that those stated are not fairly stated. Specifically, it is said that there was no nervous breakdown in 1919, and no bromide prescribed before a vacation.

General objections to questions of this character are of little aid to the trial court. If matters are stated which ought to be excluded, or if matters are excluded which ought to be stated, the objection should be so framed as to show just what the trouble is. Rule XXII of this court.

Dealing with specific objections, there was a nervous breakdown in 1919, probably as an after-result of the attack of influenza in 1918, and this breakdown was sufficiently severe to warrant Mr. Jones' temporary relief from duty. Bromides were prescribed by Dr. Carroll, and while the prescription was not regarded as a matter of any special importance, yet it was made. This assignment is also overruled.

It is next said that the court erred in permitting Dr. Thorndike to say that the facts assumed in the hypothetical question heretofore referred to indicated the presence of some nervous disease, in that it was too brief and called for an opinion not founded on sufficient facts. That it did call for an opinion is of course true. The witness was a well qualified expert. The question propounded was supported by the record, but if material facts were omitted, then they should have been called to the attention of the trial court. It was entitled to all of the assistance which can be given to us. To say that the statement of a case is too brief is, as a practical proposition, not very helpful. This assignment is overruled.

Objection is next made to a certain hypothetical question propounded to Dr. Fisher. Here again it is said that this question does not state fully the facts in the case, that there was no evidence of a breakdown in 1919, and none of consultation with a physician or of prescription of bromides. What has been heretofore said as to general objections of this character continues to apply.

It is said also that the court erred in permitting the witness to answer that certain facts there stated "would have led to our rejection of the risk," in that the issue is not what the defendant would have done but rather what was the general practice and usage of

life insurance companies in such cases. This objection was well taken but any harm done was immediately corrected.

The next question was: "I am asking you, not what you would do but what his condition as an acceptable standard risk would be, providing that the insurance company had knowledge of the conditions which I have described." "A. It would have rendered the risk a standard risk."

And so the error complained of was made harmless.

■■ Dr. Fisher was permitted to state that, in his judgment, certain facts set up in a hypothetical question indicated that the patient was not normal and that if there were repeated attacks serious results would follow, and that the mortality tables of his company, in such cases, was about one-third higher than the general average. All of this is objected to "on the ground that said questions call for an expression of opinion and for improper evidence."

Plainly, the witness was qualified to give an opinion. If anything in addition was meant by improper evidence, it is not stated in the bill. This exception is overruled.

■ The trial court refused to admit evidence to show that Jones had said to a witness that late in 1923 he intended to take out insurance for the protection of his family and to avoid financial losses such as he had recently suffered. This evidence is plainly self-servient, hearsay and incompetent.

■ There are a number of objections dealing with instructions. Detailed consideration is not necessary. Nothing in them prevented the jury from finding for the plaintiff. For reasons stated, we are of opinion that facts about which there is no substantial dispute sustain the action of the trial judge. That is to say,

we are of opinion that wholly independent of any instructions which may have been given or refused, no other judgment could have been entered. The case is with the defendant. It is not intended to intimate that there is anything wrong with the instructions. All that we say is that their examination is unnecessary.

In reaching this conclusion, we have not lost sight of the well established rule, that in actions on insurance policies the insured should be protected by every proper presumption, for it is the policy of courts to uphold such contracts when it can be in good conscience done, and usually the intervention of death prevents any statement by the insured of his side of the controversy. But, as we have seen, the court is charged with the duty of deciding the materiality of facts proven.

For reasons stated, the judgment appealed from must be affirmed, and it is so ordered.

*Affirmed.*