# Richmond

LILLIE RAMEY, ET AL. v. IDA J. RAMEY.

April 26, 1943.

Record No. 2647.

Present, All the Justices.

The opinion states the case.

*George M. Beltzhoover, Jr.,* and *W. W. Butzner,* for the plaintiffs in error.

*Moore & Williams,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

On December 9, 1919, W. T. Ramey executed this note:
"$4,000.00      Charles Town, W. Va.      Dec. 9, 1919
"On demand I promise to pay to the order of Gertie Ramey Four Thousand (Interest from date) Dollars. Value received.   Payable at the Bank of Charles Town,
Charles Town, W. Va.
Credit the drawer.
W. T. RAMEY."

On it Mrs. W. T. Ramey appears as an endorser.  She is the Ida J. Ramey who is the defendant here.

This note was probably written by Miss Gertrude Ramey. When executed there were present Mr. W. T. Ramey and his wife and the three sisters—Miss Gertrude, Miss Lillie and Miss Laura.  Miss Gertrude drew the check therefor; it was payable to the order of W. T. Ramey and Ida J. Ramey, who, as we have seen, was Mrs. W. T. Ramey. These sisters kept a joint bank account in the Bank of

Charles Town, Charles Town, West Virginia, and on it each of them had the right to check and did check. That this check for $4,000 was then cashed and its proceeds paid over to Mr. and Mrs. Ramey does not merit further discussion. How its proceeds were used we do not know. Interest in full was paid to December 9, 1936.

Miss Gertrude Ramey died testate in 1932, leaving all of her property to her sisters, Lillie and Laura. W. T. Ramey died in 1940. Had action been brought against his estate, his personal representative would have been obliged to plead the statute of limitations, so it was not brought.

On December 9, 1940, Miss Lillie Ramey and Miss Laura Ramey went to the home of the defendant, Ida J. Ramey. The object of their visit was to have this defendant execute a new and renewal note for the $4,000 of date December 9, 1919. These three ladies, together with Mrs. French Ramey —wife of French Ramey, a brother—went into conference in a room in the defendant's home. All of them remained in that room until their purpose had been accomplished, with these exceptions: Mrs. French Ramey went once to a telephone in another room and there was an adjournment for lunch.

Miss Lillie Ramey produced the new note for $4,960. "Renewal" was endorsed on its face. Mrs. Ramey looked at it and expressed surprise at its amount. The $960, she was told, represented interest which had accumulated on the old note and was unpaid. She said that she had been advised by Mr. Beltzhoover not to sign any notes. After some discussion it seemed advisable to consult Mr. Beltzhoover, and she said to Mrs. French Ramey: "Will you go to the telephone?"—She went and returned, giving this account of her effort to reach him: "She asked me to go to the telephone and call up Mr. Beltzhoover and if it was all right with him she would sign it. I went to the telephone, could not get him, come back and told them I could not, that is all I said."

The defendant then went alone into her room upstairs for pen and ink, signed the note, came down and gave it

to Miss Lillie. She was eighty-four years old when testifying and quite deaf. This is her account of that incident:

"When the note was presented to me I was shocked and astonished for a minute. I said, 'I cannot, I promised Mr. Beltzhoover not to sign any notes.' She said if he said so will you? I said, 'If he said so I will sign the note,' not dreaming he would say so. The next thing I remember— I had the shock of my husband's death—the next thing I think it was Miss Lillie Ramey—I know it was her—handed me the note and I understood her to say he says sign it, so I said, 'I will have to go upstairs, my pen and ink is upstairs'; I went up and that is all I remember about it."

Miss Lillie Ramey, Miss Laura Ramey and Mrs. French Ramey all say that Miss Lillie Ramey made no such statement as that testified to by the defendant. Miss Lillie Ramey did not go out of the room during this conference, and there was no telephone in it. She knew nothing about Mr. Beltzhoover's admonition. In these circumstances and in view of the report which Mrs. French Ramey had just made to all in the conference room, it is highly improbable that she made the statement attributed to her. It was the defendant who had requested Mrs. French Ramey, a witness not directly interested, to get in touch with Mr. Beltzhoover. This witness' report was to all of those present. She either heard that report or did not, and if she was in any doubt about it, she should have asked that it be repeated. And it is to be remembered that this defendant is not relying upon what Mrs. French Ramey told her but upon what Lillie Ramey said—"I know it was her."

In passing, it should be said that Mr. Beltzhoover was not then the defendant's lawyer, and the salutary advice which he gave her was general and referred to no particular note and certainly not to that in judgment.

That a jury's verdict, approved by the trial judge, settles disputes in evidence is ancient law. But evidence relied upon to sustain a verdict must be credible evidence.

Want of consideration cannot be relied upon. Mrs. Ida J. Ramey might have pleaded the statute, but she was not ob-

liged to do it, and her moral obligation continued. Indeed, after the sisters had gone home she said: " * * * she had renewed that note now and she would have to pay it."

"It is settled in this State that the running of the statute of limitations merely bars the creditor's remedy but does not extinguish the debt. *Smith's Ex'x* v. *Washington City, etc., Co.*, 33 Gratt. (74 Va.) 617, 620, 621; *Virginia Hot Springs Co.* v. *McCray*, 106 Va. 461, 474, 56 S. E. 216, 10 L. R. A. (N. S.) 465, 10 Ann. Cas. 179." *Fidelity, etc., Co.* v. *Lackland*, 175 Va. 178, 8 S. E. (2d) 306.

"The original debt is generally considered to be a sufficient legal consideration for a subsequent new promise to pay it, made either before or after the bar of the statute is complete." 34 Am. Jur., sec. 298.

Adverting for a moment to the evidence relied upon to sustain a verdict approved by the trial judge, it must be evidence which the jury had a right to believe. Were that not true, this court would be powerless to correct an error however gross.

In *Gillespie* v. *Somers*, 177 Va. 231, 13 S. E. (2d) 330, we said: "A judgment that is plainly wrong or without evidence to support it should not be allowed to stand. (Code, sec. 6363)"

In *Langford* v. *Commonwealth*, 154 Va. 879, 153 S. E. 821, is this statement of the law:

"By statute it is provided, Code, section 6363, that: 'The judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong, or without evidence to support it.' *David* v. *Commonwealth*, 132 Va. 527, 110 S. E. 252; *Nelson* v. *Commonwealth*, 153 Va. 909, 150 S. E. 407. Of course the evidence relied upon must not strain the credulity of the court; in short, it must fairly sustain the verdict. *Flannagan* v. *Northwestern Mutual Life Insurance Co.*, 152 Va. 38, 146 S. E. 353; *Meade* v. *Saunders*, 151 Va. 636, 144 S. E. 711."

And this principle was reaffirmed by Mr. Justice Gregory in *Gillespie* v. *Somers, supra.* Proof of fraud must be clear and convincing.

See also *Tabb* v. *Willis*, 155 Va. 836, 156 S. E. 556.

■ The judgment relied upon is plainly wrong and must be reversed. Final judgment should be entered for the plaintiffs.

*Reversed and final judgment.*