RICHARD L. ANDREWS, EXECUTOR OF THE ESTATE OF
EARL L. BALLENGER, JR.

V.

AMERICAN HEALTH AND LIFE INSURANCE COMPANY

Record No. 860001

September 23, 1988

Present: All the Justices

*James F. Pascal (John C. Ivins, Jr.; Hirschler, Fleischer, Wein-berg, Cox & Allen,* on briefs), for appellant.

*A. James Kauffman (Clayton L. Walton; Taylor, Hazen & Kauffman,* on brief), for appellee.

WHITING, J., delivered the opinion

In this appeal, we decide two issues, first, whether the phrase "nervous disorder," as used in a question contained in an application for a credit life insurance policy, is ambiguous and should be construed against the insurer; and second, whether the insured's executor is estopped from collecting the proceeds of the policy.

On September 10, 1979, Earl L. Ballenger, Jr. was admitted to Chippenham Hospital under the care of Dr. Charles A. Binford, a psychiatrist, for depression following his accidental fatal shooting of his wife on September 2, 1979. After four days, Ballenger was discharged from the Chippenham Hospital, and he had four subsequent therapy sessions with Dr. Binford. During one of those contacts, Ballenger said that he entertained the idea of suicide.

In February 1980, Ballenger borrowed $37,000 from Standard Federal Savings and Loan Association (Standard) to finance the purchase of his home. Ballenger executed a note evidencing the debt, which was secured by a first deed of trust upon the property.

As additional security for the payment of the loan, Ballenger applied for a decreasing term credit life insurance policy to be issued by American Health and Life Insurance Company (the insurance company). Question number four in the application was whether Ballenger had "consulted or been treated by a physician within the last five years for heart trouble, high blood pressure, chest pains, heart murmurs, cancer, diabetes, albumin or sugar in the urine, tuberculosis, *epilepsy or nervous disorder*, stomach trouble or any ailment of the kidney, gall bladder or liver." (Emphasis added.) Ballenger answered that question in the negative, and he did not disclose his September 1979 hospitalization and psychiatric treatments.

After reviewing Ballenger's application, the insurance company issued the policy on November 1, 1980, listing Standard as the applicant and the primary beneficiary. Ballenger's estate was the secondary beneficiary with respect to any remaining balance due on the insurance policy after the indebtedness on the house had been paid. Ballenger paid the required monthly premiums during his life.

On July 2, 1981, within the two-year contestability period of the policy, Ballenger was murdered. The insurance company declined to pay the proceeds of the policy to Standard because of Ballenger's failure to disclose his treatment by Dr. Binford. By a

check enclosed in a letter dated November 18, 1981, the insurance company refunded all premiums paid during Ballenger's life to Standard. Standard cashed the insurance company's check and mailed its check for the same sum to Richard L. Andrews, Executor of Ballenger's estate, but Andrews did not cash the check. Andrews continued to make the monthly deed of trust payments to Standard until he sold the house on September 30, 1983. Andrews paid the balance due on Standard's deed of trust from the proceeds of the sale and brought this action to recover the amount he paid in discharge of the deed of trust.

After a bench trial, the trial court held that the term "epilepsy or nervous disorder," as used by the insurance company in the application, was ambiguous and could be construed reasonably not to include emotional or mental disorders. Accordingly, it concluded that Ballenger had not misrepresented his health by failing to report his treatment by Dr. Binford and, for that reason, the insurance company was not entitled to rescind the policy. At a later date, following receipt of memoranda, the trial court held that Ballenger's executor lacked "standing" to bring the claim against the insurance company. We granted an appeal to each party aggrieved by an adverse ruling.

The insurance company claims that Ballenger misrepresented his health in the application, giving it the right to rescind the policy within the contestability period. The insurance company contends that the phrase "epilepsy or nervous disorder" plainly and unambiguously includes a period of depression with "suicidal ideations" for which medical treatment was sought.

■ The question is whether the phrase unambiguously includes mental disorders as contrasted with physical disorders of the nervous system. If the term is ambiguous, it will be construed against the insurance company and in favor of coverage. *United Services Automobile Assoc.* v. *Webb*, 235 Va. 655, 657, 369 S.E.2d 196, 198 (1988).

■ There are a number of definitions of "nervous" in *Webster's Third New International Dictionary* 1519 (1986). One is "of, relating to, or made up of nervous tissues"; another is "of or relating to the nerves: originating in or affected by the nerves"; yet another is "tending to produce nervousness or agitation." Thus, we conclude that the phrase "nervous disorder," standing alone, is a general term which might include physical or mental disorders, or both.

We must, however, construe the phrase in accordance with the maxim *noscitur a sociis*. The principle instructs that "the meaning of a word takes color and expression from the purport of the entire phrase of which it is a part, and it must be read in harmony with its context." *Turner* v. *Commonwealth*, 226 Va. 456, 460, 309 S.E.2d 337, 339 (1983).

The phrase "epilepsy or nervous disorder" as used in question four in Ballenger's application was one of a series of questions contained in one sentence. Every other question in the sentence, including the question about epilepsy,[1] grouped together in the same phrase with nervous disorder, dealt with a general physical disorder. Given the ambiguity of the phrase and the associated words in the same sentence, we decide that the term could be construed reasonably only as an inquiry about a physical disorder of the nerves.

The case of *Flannagan* v. *Mutual Ins. Co.*, 152 Va. 38, 146 S.E. 353 (1929), *overruled in part*, *Gilley* v. *Union Life Ins. Co.*, 194 Va. 966, 974, 76 S.E.2d 165, 170 (1953), upon which the insurance company relies, is inapposite. In *Flannagan*, we held that an insurance company was not required to pay the proceeds of a life insurance policy where an insured failed to disclose his prior medical and hospital treatments resulting from "nervous breakdowns." 152 Va. at 70, 146 S.E. at 362. The question asked in the *Flannagan* insurance application was whether the applicant "had since childhood any of the following diseases or symptoms . . . . [m]ental [d]erangement or any nervous disease." *Id.* at 50, 146 S.E. at 356. A "nervous disease," when used in the same context as "mental derangement," clearly includes a mental condition encompassing the insured's "nervous breakdowns" described in *Flannagan*.

Because we conclude that the phrase "nervous disorder," as used in this application, is ambiguous and could be read to refer only to physical disorders, we find that Ballenger did not answer question four untruthfully when he failed to disclose his periods of depression for which he sought medical attention. Accordingly, we will affirm the trial court's finding that Ballenger's answer in the

---

[1] *Webster's Third New International Dictionary* 763 (1986), defines epilepsy as a "chronic nervous disorder of man and other animals that involves danger in the state of consciousness and of motion and that is due either to an inborn defect which produces convulsions of greater or lesser severity with clouding of consciousness or to an organic lesion of the brain produced by tumor, injury, toxic agents, or glandular disturbances."

application did not give the insurance company grounds to rescind the policy.

■ Andrews appealed the trial court's finding that he had no standing to maintain this action. Standing to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action. *Allen* v. *Wright*, 468 U.S. 737, 750-51 (1984). We have described standing as the requirement that a litigant have a "sufficient interest in the subject matter of [a] case so that the parties will be actual adversaries and the issues will be fully and faithfully developed." *Cupp* v. *Board of Supervisors*, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984).

■ A provision in Standard's policy resolves the issue of whether Andrews had standing. The policy provided in pertinent part as follows:

> The beneficiary shall be the Applicant, without right of revocation, to the extent of the insured's indebtedness to, or serviced by, the Applicant; and any amount so paid shall be applied to reduce or extinguish such indebtedness. With respect to the balance remaining, if any, the Insured may designate a beneficiary. . . . If, with respect to any amount of insurance, the Insured fails to designate a beneficiary . . . payment shall be made to the duly qualified executors or administrators of the Insured's estate.

Because Ballenger failed to designate such a beneficiary, Andrews, as executor of Ballenger's estate, became the secondary beneficiary of the policy and, accordingly, had a sufficient interest in this litigation to give him standing to attempt to collect its proceeds.

All the insurance company's defenses are based upon its contention that Ballenger's contractual rights were dependent upon the rights of Standard.[2] The insurance company misunderstands the nature of the contract it had with Standard and with Ballenger.

---

[2] Those defenses may be summarized as: (1) Standard did not assign its rights; (2) there were no excess funds due the estate from the insurance company when Ballenger died, and his executor's later payment of the debt cannot create a right of action in the estate; (3) there was no right of subrogation because no primary and secondary obligors; (4) if there was a right of subrogation, the primary party, Standard, released the debtor by cashing the premium refund check, and the estate, the secondary party, takes the claim subject to that defense; and (5) the estate cannot be a third party beneficiary to the insurance contract because it was named as a direct beneficiary.

For valuable consideration furnished by Ballenger, the insurance company agreed to pay to Standard or to Ballenger's estate upon Ballenger's death whatever sums were payable on the schedule contained in the application and made a part of the policy, at the end of each policy year, decreasing "proportionally from month to month during a policy year." The policy could be terminated only (1) for non-payment of the premiums, (2) by surrender of the policy by the owner,[3] (3) by the insurance company's payment of a claim under the policy, or (4) at the end of the term of insurance.

■ The policy does not contemplate a reduction in the amount payable because of a corresponding reduction in the indebtedness, whether in whole or in part. On the contrary, it provides for that eventuality by indicating that if there is an excess over the amount of the debt owed Standard on the date of Ballenger's death, the insurance company will pay Ballenger's estate any such excess amount. Thus, if the debt had been reduced during Ballenger's lifetime by his prepayments of the monthly installments, or if the debt had been reduced before or *after* Ballenger's death by Standard's receipt of funds from a collateral source, Ballenger's estate would be entitled to that excess under the terms of the insurance contract. This contractual agreement between the insurance company and Ballenger, during his life, and his estate, as his successor in interest after his death, is independent of Standard's rights under the contract.

Accordingly, when Andrews made the regular monthly payments after Ballenger's death and finally paid the debt in order to pass good title upon sale of the house, the estate became entitled to the principal amount due on the policy at the time of Ballenger's death. The parties have agreed that the sum of $37,085.61 is owed in the event the insurance company is held liable.

The judgment therefore, will be reversed, and we will enter final judgment in the sum of $37,085.61 for the executor, with interest at the statutory rate from the date of Ballenger's death.

*Reversed and final judgment.*

---

[3] The policy provides that: "With respect to all transactions regarding this policy, *except those specifically reserved herein to the Insured or beneficiary*, the Company may deal with the Applicant on the basis that the Applicant has full ownership and control of this policy." (Emphasis added.) We construe the policy and the statutory provisions for payment of the proceeds to a secondary beneficiary as a right specifically reserved to the insured during his life and to his beneficiaries after his death.