**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-2285

CAROLINA CASUALTY INSURANCE COMPANY,

Plaintiff - Appellant,

versus

DRAPER & GOLDBERG, P.L.L.C.,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  James C. Cacheris, Senior District Judge.  (CA-03-1346-1)

Argued:  May 26, 2005                    Decided:  July 8, 2005

Before WILLIAMS and SHEDD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Reversed and remanded by unpublished opinion.  Judge Shedd wrote the majority opinion, in which Judge Williams joined.  Senior Judge Hamilton wrote a dissenting opinion.

**ARGUED:**  Richard Albert Simpson, ROSS, DIXON & BELL, L.L.P., Washington, D.C., for Appellant.  John Henry Zink, III, VENABLE, L.L.P., Towson, Maryland, for Appellee.  **ON BRIEF:** Lynda Guild Simpson, Kelly V. Overman, ROSS, DIXON & BELL, L.L.P., Washington, D.C.; Dennis J. Quinn, CARR MALONEY, P.C., Washington, D.C., for Appellant.  Kathleen E. Wherthey, VENABLE, L.L.P., Towson, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

SHEDD, Circuit Judge:

Carolina Casualty Insurance Company ("Carolina Casualty") filed this diversity action seeking to rescind the professional liability insurance policy it issued to Draper & Goldberg, PLLC ("D&G"), a Virginia law firm also practicing in Maryland, Delaware, and the District of Columbia. Carolina Casualty claims that D&G made material misrepresentations in its application for "Lawyers' Professional Liability Insurance" by failing to divulge approximately 500 lawsuits filed against it. After both parties filed motions for summary judgment, the district court granted judgment in favor of D&G. Carolina Casualty appeals, and we reverse and remand.

## I.

We review de novo the district court's grant of summary judgment. Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Edell & Assocs. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 436 (4th Cir. 2001). Moreover, when the language of a contract is plain and unambiguous, its interpretation is a question of law that may be determined by the court on a motion for summary judgment. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992). Although

3

the material facts in this case are not in dispute, we conclude that the district court erred in granting summary judgment in favor of D&G by misinterpreting the meaning of the phrase "professional liability claim" in the Carolina Casualty insurance application.

## II.

D&G specializes in mortgage foreclosures, and its clients are typically mortgage servicing companies or mortgage lenders. In representing its clients in foreclosure actions against debtors, D&G is routinely named as the successor trustee. Quite often, debtors will attempt to block the foreclosure actions against their property and will sue D&G as a party defendant in its capacity as successor trustee. In the five years before applying for professional liability insurance from Carolina Casualty, D&G was named as a party defendant in approximately 500 foreclosure or other similar lawsuits. Moreover, D&G received "[c]ountless" claim letters that ultimately did not result in lawsuits. J.A. 186. In reviewing the suits filed and claims made against it, D&G would first determine whether it had made a mistake and, if so, whether the suit or claim posed a significant risk of liability. Because D&G deemed the vast majority of these suits and claims to be frivolous, the firm routinely represented itself in those cases. D&G considered some claims to be somewhat problematic, but the firm nevertheless decided to represent itself also in those matters. Of these problematic

4

cases, D&G ultimately paid settlements ranging from $1,000 to $20,000. The largest settlement -- $20,000 -- involved a suit by a nonclient debtor who alleged that D&G violated the Fair Debt Collection Practices Act in the course of a foreclosure action. D&G eventually retained counsel in that action after the judge presiding over the case disqualified the firm from representing itself.

Of the approximately 500 lawsuits filed and numerous claims made against it, D&G considered five claims or suits to pose such a serious risk of liability that it sought defense and indemnity from its previous professional liability insurance carriers. All five suits or claims were brought by nonclients of the firm. Three suits were filed by debtors seeking liability against D&G for its participation in foreclosure actions. One of these three suits was very similar to the Fair Debt Collection Practices Act case that D&G settled for $20,000.

In the summer of 2002, David Draper, one of the principals of D&G, began seeking a new professional liability policy for the firm because D&G's existing carrier had notified the firm that it was discontinuing its professional liability insurance line. Draper was having difficulty obtaining reasonable price quotes from other carriers, so he attended a state bar meeting primarily to contact insurance providers. At the meeting Draper met an insurance broker and explained that his firm had been sued many times in foreclosure actions. The broker inquired how many claims D&G had reported to

5

its insurance carriers seeking defense and indemnification.  When Draper informed the broker that D&G had submitted only a few of the numerous suits and claims to its carriers for coverage, the broker said that she could probably obtain a professional liability policy for the firm.

The broker initially sought insurance for D&G from CNA.  CNA, however, rejected D&G's application because of its policy of not insuring law firms with prior claims.  The broker then sent D&G an application form from Carolina Casualty.  Question 16 of the Carolina Casualty application asked, "Has any professional liability claim been made against the Applicant Firm . . . during the past 5 years?"  J.A. 17 (emphasis added).  If the applicant answered "yes," the form directed the applicant to "provide details on the Claim/Incident Supplemental Form."  Id.  The supplemental form directed the applicant to "complete one form for each claim, suit, or circumstance during the last 5 years."  J.A. 22.  Question 6 of the supplemental form asked, "Has this [claim], suit, or circumstance been reported to any insurance carrier?"  Id. (emphasis added).

Rather than report the approximately 500 suits filed and the countless claims made against it, D&G instead provided details on the supplemental forms regarding only the five nonclient lawsuits and claims that it had previously submitted to its prior insurance carriers for coverage.  Draper interpreted Question 16 as requesting

information relating only to suits and claims previously reported to its insurance carrier -- whether by clients or nonclients. His interpretation was influenced by the broker's comments to him at the bar meeting, suggesting that the insurance company would decide whether to issue a policy based on reported suits and claims only. Draper and the broker never specifically discussed Question 16 on the Carolina Casualty application. On each of the supplemental forms, D&G answered "yes" to Question 6 -- that it had reported the claim or suit to its prior professional liability insurance carrier. D&G verified that all the answers it provided in its application were true.

A Carolina Casualty underwriter[1] reviewed the firm's application and determined that only four of the five previous incidents reported by D&G were responsive to Question 16. One of the reported incidents was deemed nonresponsive to the question because it occurred more than five years before D&G applied for the Carolina Casualty policy. Based on the four responsive incidents, the underwriter determined that D&G presented a slightly higher probability of future claim activity. The underwriter nevertheless recommended that the risk was acceptable provided that D&G pay a higher deductible and premium. D&G accepted the Carolina Casualty

_____

[1]The underwriter was employed by Monitor Liability Managers, Inc., a sister company of Carolina Casualty that handled all underwriting and claims processing for Carolina Casualty. For purpose of simplicity, we refer to the underwriting and claims officials as Carolina Casualty employees.

policy, and the parties agree that the application form completed by D&G is part of the contract of insurance.[2]

In May 2003, less than four months after obtaining the Carolina Casualty policy, D&G was sued by a nonclient debtor in an adversary proceeding in bankruptcy court arising out of a foreclosure action in Maryland. D&G concedes that the nonclient debtor's complaint alleges "errors or omissions by D&G arising out of its professional services." Response Brief, p. 4. The debtor also sued Option One Mortgage Corporation, the lender that D&G was representing in the underlying foreclosure action. The debtor claims that D&G, as legal counsel for the lender and as substitute trustee in the foreclosure action, submitted sham fees for services that were never performed and other fees that were well in excess of the reasonable and customary charges. Among several other claims, the debtor alleges that D&G breached its fiduciary duty to her by claiming bogus and excessive fees in the foreclosure action and that D&G's conduct constituted a violation of the Fair Debt Collection Practices Act. The debtor seeks class certification, alleging that D&G has charged sham and excessive fees in hundreds of similar foreclosure actions.

---

[2]Under Virginia law, an insurance application is not typically considered part of the insurance policy but is instead an offer to enter into a contract. Smith v. Colonial Ins. Co., 515 S.E.2d 775, 777 (Va. 1999). Carolina Casualty, nevertheless, admits that the application in this case is part of the policy, so we deem it as such.

The debtor also seeks both compensatory and punitive damages in excess of $1 million.

Even though the proposed class action was filed by a nonclient of the firm, D&G reported the lawsuit to Carolina Casualty, seeking defense and indemnification under its "lawyer's professional liability insurance policy." J.A. 75. Carolina Casualty agreed to provide a defense to D&G under a reservation of rights. Soon after the debtor's suit was filed, Option One, D&G's client in the debtor's foreclosure, demanded defense costs and indemnification from D&G relating to the proposed class action, claiming that the debtor's claim against Option One arose out of the alleged improper fees charged by D&G. D&G also notified Carolina Casualty about Option One's claim against it.

Two weeks later, D&G was sued in a similar proposed class action lawsuit in Maryland state court. The plaintiffs -- all nonclient debtors -- alleged that D&G charged excessive and sham fees in foreclosure actions. Like the adversary proceeding in bankruptcy court, the state court complaint alleges that D&G breached its fiduciary duty to the nonclient debtors and that D&G violated the Fair Debt Collections Practice Act. In addition, the state court complaint alleges a negligence claim against D&G. This complaint, like the bankruptcy adversary proceeding, seeks damages in excess of $1 million.

D&G promptly notified Carolina Casualty of the Maryland state court lawsuit, seeking defense and indemnity under its "Lawyers' Professional Liability Policy." J.A. 82. Carolina Casualty agreed to defend and indemnify D&G, but again reserved its rights not to pay punitive damages. Carolina Casualty further reserved its rights to continue to investigate other grounds it might have to avoid providing coverage in both the bankruptcy and Maryland state court lawsuits.

Soon after receiving notice of the two proposed class action suits against D&G, representatives of Carolina Casualty's underwriting and claims departments met to discuss the D&G account. During that meeting, one of the representatives did a computer search to see if other lawsuits had been filed against D&G. That search revealed eight other lawsuits that D&G had not reported on its insurance application. Based on this new information, the group determined that it should hire a separate law firm to pursue rescinding the policy issued to D&G. That law firm discovered a total of twenty-four lawsuits filed against D&G that D&G had failed to report on its insurance application. Counsel for Carolina Casualty informed D&G of these newly discovered suits and stated that they could possibly constitute grounds for rescission of the policy. Counsel also stated that Carolina Casualty "is well aware that the potential for a rescission of a policy is a serious matter, and therefore, prior to taking any action, wanted to raise this

10

issue with [D&G] to obtain as much information as possible . . . . Specifically an explanation of why [D&G] did not identify these numerous other matters on its application for insurance is needed." J.A. 108.

In response, D&G asserted that it answered Question 16 on the application correctly. It interpreted Question 16 to mean that "it was only required to advise Carolina Casualty of professional liability claims for damages which D&G had determined needed to be submitted to the E&O carrier for indemnification and/or defense. . . . The [five] cases previously listed by D&G were cases which it felt needed to be reported to the carrier(s) for the carrier(s) to handle." J.A. 115 (emphasis added).


III.

Based on its determination that D&G had materially misrepresented its claims history by failing to report the twenty-four other lawsuits discovered during its investigation, Carolina Casualty brought this action seeking to rescind D&G's professional liability policy. Carolina Casualty alleges that it would not have issued the policy to D&G had it known of the twenty-four other lawsuits.

After the close of discovery, the parties filed cross-motions for summary judgment in which each party advanced a different interpretation of the phrase "professional liability claim" in

11

Question 16 of the insurance application. The district court ruled in favor of D&G deciding, as a matter of law, that the phrase "'professional liability claim' unambiguously means negligence claims alleged against an attorney by his clients." J.A. 458. To reach this result, the district court engrafted a limitation under Virginia legal malpractice law providing that Virginia attorneys owe a duty to their clients only. Based on its interpretation that "professional liability claims" are necessarily claims by clients only, the district court determined that D&G was not required to divulge any information on the insurance application about the approximately 500 lawsuits against D&G filed by nonclients. Thus, the district court ruled that D&G had truthfully answered Question 16. The district court further determined that D&G's listing of the five claims by nonclients on the insurance application was merely gratuitous since D&G had no duty to disclose any of the nonclient claims.

IV.

Carolina Casualty argues that the district court erred in granting summary judgment in favor of D&G because it answered Question 16 untruthfully by failing to fully report its claims history and that this omission was material to the risk of insuring D&G. We agree.

12

Under Virginia law, an insured is obligated to answer an application truthfully and fully to give the insurer the opportunity to make its own inquiry and determine whether to undertake the risk. Mutual of Omaha Ins. Co. v. Echols, 154 S.E.2d 169, 172 (Va. 1967). An insurance company is entitled to rescind a policy of insurance based on a representation in the application only if it clearly proves that (1) the insured's representation in the application was untrue; and (2) the insurance company's reliance on the false statement was material to its decision to assume the risk and issue the policy. Va. Code Ann. § 38.2-309; Commercial Underwriters Ins. Co. v. Hunt & Calderone, P.C., 540 S.E.2d 491, 493 (Va. 2001). The insurance company is not required to show that the insured's misrepresentation was willfully false. Chitwood v. Prudential Ins. Co., 143 S.E.2d 915, 919 (Va. 1965); Inter-Ocean Ins. Co. v. Harkrader, 67 S.E.2d 894, 897-98 (Va. 1951).

A.

To be entitled to rescind the policy, Carolina Casualty must first clearly prove that D&G misrepresented facts on the application. To determine whether D&G answered Question 16 truthfully, we must first determine the meaning of "professional liability claim."

Under Virginia law, an insurance policy is a contract and, like any other contract, the words used must be given their ordinary and

13

customary meaning if they are susceptible to such a construction. Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., 397 S.E.2d 876, 877 (Va. 1990).  An insurance provision is ambiguous only if it may reasonably be understood in more than one way or when such language refers to two or more things at the same time.  Salzi v. Virginia Farm Bureau Mut. Ins. Co., 556 S.E.2d 758, 760 (Va. 2002).  "A well-settled principle of contract law dictates that 'where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.'"  Ross v. Craw, 343 S.E.2d 312, 316 (Va. 1986) (quoting Globe Iron Constr. Co. v. First Nat'l Bank of Boston, 140 S.E.2d 629, 633 (Va. 1965)).

Thus, we begin our review of the meaning of Question 16 by giving the words their ordinary and customary meaning.  Question 16 asks, "Has any professional liability claim been made against the Applicant Firm . . . during the past 5 years?"  J.A. 17 (emphasis added).  The plain and ordinary meaning of the words "professional liability claim"  encompasses any type of claim[3] attempting to assert liability against the applicant law firm arising out of its

---

[3]The supplemental form clarifies that "claim" includes at least any "[claim], suit, or circumstance."  J.A. 22.  It is clear that D&G understood "claim" to encompass both demand letters and lawsuits.  On the five supplemental forms it completed, it reported both demand letters and lawsuits.

14

rendering of legal services.[4]  Because Question 16 on its face is susceptible to only one reasonable interpretation, we find it unambiguous.

D&G disagrees, arguing instead that "professional liability claim" is necessarily limited to only negligence claims against an attorney by his client, i.e, legal malpractice claims.  The primary shortcoming of this interpretation is that it is not based on the actual words used in Question 16.  Question 16 does not ask the applicant to provide information about negligence claims only, and neither does it limit claims to those made by clients only.  These limitations are not found on the face of Question 16.  To find them, D&G must import them from the Virginia law of legal malpractice, which the unambiguous words of Question 16 do not require or suggest.  D&G has not cited, nor can we find, Virginia case law suggesting that "professional liability" is coterminous with "legal malpractice."  Because no ambiguity exists on the face of Question 16, we interpret it according to its plain, ordinary meaning without importing other meanings from outside the text.

In the alternative, D&G argues that the meaning of "professional liability claim" is ambiguous and that we must

_____

[4]D&G complains that this definition is so broad that it would include a claim by a court reporter for D&G's failure to pay for a deposition transcript.  We disagree.  Such a claim would not arise out of the firm's practice of law.  Instead, it would arise out of D&G's breach of its contractual obligation to pay the court reporter for the deposition.

15

construe any ambiguity against Carolina Casualty and in favor of coverage. Because we have already concluded that no ambiguity exists, this argument fails. However, even if we were to conclude that the phrase "professional liability claim" is ambiguous, we would not affirm the district court's grant of summary judgment under the unique facts and circumstances of this case.

Although Virginia follows the general rule that ambiguities in an insurance contract -- and insurance applications -- will be construed in favor of the insured,[5] this rule of contract construction applies when there is evidence that the ambiguity in the insurance application could have misled the applicant into providing false information. See Andrews v. American Health and Life Ins. Co., 372 S.E.2d 399, 401 (Va. 1988). For instance, in Andrews, the life insurance application inquired whether the applicant had been treated for "epilepsy or nervous disorder." Id. The applicant did not divulge that he had previously been treated for depression, and the life insurance company issued the policy based on the representations in the application. The insured died soon after obtaining the policy, and his estate made claim for the

---

[5]This general principle of contract construction should not be applied indiscriminately. It has limits. One implicit limit is Virginia Code § 38.2-309, which allows an insurer to rescind a policy if it can clearly show, among other things, that the insured answered the insurance application untruthfully. It is clear in this case that D&G answered Question 16 untruthfully – even according to its own interpretation of the words used -- when it completed the application.

16

life insurance benefits. The insurance company sought to rescind the policy based on the insured's failure to supply information on the insurance application about his prior treatment for depression. Id. The Virginia Supreme Court determined that "nervous disorder" was ambiguous, and the insured could have reasonably read "nervous disorder" not to include the emotional problems for which he had previously received treatment. Construing this ambiguity in favor of coverage, the Virginia Supreme Court ruled that the insurance company failed to clearly prove that the insured answered the insurance application untruthfully. Id. at 402.

Unlike Andrews where there was no evidence of how the insured actually interpreted "nervous disorder," we have in this case uncontradicted evidence that D&G construed "professional liability claim" to include claims by nonclients. In fact, the only claims that D&G divulged in its application were nonclient claims. It cannot now claim, based on its post-litigation construction of Question 16, that an ambiguity misled it into failing to make a full and truthful response. D&G believed that Question 16 encompassed claims by nonclients, yet it failed to report more than 500 nonclient claims -- some of which were similar to the five claims that it reported on its application and the two claims for which it now seeks a defense and indemnity from Carolina Casualty.[6]

---

[6]Draper testified that he was influenced by the insurance broker's questions about how many claims D&G had reported to its prior carriers. Based on the broker's comments, Draper concluded

17

Accordingly, D&G is not entitled to the benefit of Virginia's rule of construction in favor of insureds, because it failed to answer Question 16 fully and truthfully under its literal understanding of the question when it completed the application.[7]

In sum, we conclude that the phrase "professional liability claim" unambiguously includes all claims seeking to assert liability against D&G arising out of its practice of law. We also decide that the approximately 500 lawsuits that were filed against D&G in its capacity as foreclosure trustee are "professional liability claims." Because D&G failed to report these claims on its insurance application, we conclude, as a matter of law, that D&G failed to answer Question 16 fully and truthfully.

_____

that the insurance company would be interested only in <u>reported</u> claims – claims that it had sought a defense and indemnity for from its prior professional liability carriers. This conclusion is soundly contradicted by the record. First, as Draper readily acknowledged in his deposition, there is no language in Question 16 that limits the inquiry to reported claims only. Second, Draper's conversation with the broker occurred several months before the broker provided the Carolina Casualty application to D&G, and the broker did not provide any guidance to D&G relating to Question 16. Third, the supplemental form -- which is part of the contract -- asks, "Has this [claim or suit that you are divulging to Carolina Casualty] been reported to any insurance carrier?" J.A. 22. D&G checked "yes" rather than "no" on all five supplemental forms. Accordingly, it is clear that Carolina Casualty wanted to know about reported <u>and</u> nonreported claims and that D&G had no legitimate basis to believe that Question 16 was literally asking about reported claims only.

[7]Although the district court determined that D&G merely volunteered information regarding nonclient claims, there is no evidence that D&G reported the nonclient claims thinking it was providing nonresponsive information.

18

B.

In addition to showing that the insured misrepresented or omitted facts on an insurance application, to be entitled to rescind a policy the insurance company must also clearly prove that the misrepresentation or omission was material to the risk when assumed. Montgomery Mut. Ins. Co. v. Riddle, 587 S.E.2d 513, 515 (Va. 2003). A false representation is material if a truthful answer would have reasonably influenced the insurance company's decision to issue the policy. Id.; Echols, 154 S.E.2d at 172. When an insurer has proved that the insured misrepresented a fact in the application, the materiality of that misrepresentation is a question of law for the court. United States Fid. and Guar. Co. v. Haywood, 177 S.E.2d 530, 532 (Va. 1970).

Two Carolina Casualty representatives testified that the company would not have issued the professional liability policy to D&G had it known of even a small fraction of the hundreds of foreclosure lawsuits that D&G failed to report on its application. These representatives stated that the mere fact that D&G had been named in so many suits rendered D&G an unacceptable risk to Carolina Casualty.[8] Accordingly, we conclude that D&G's omission of its full claim history was material because Carolina Casualty would have been reasonably influenced to reject D&G's application for professional

---

[8]This testimony is not surprising especially in light of CNA's rejection of D&G's application for having previous claims.

19

liability insurance had it known of D&G's claim history when it issued the policy. See Inter-Ocean Ins., 67 S.E.2d at 896-98 (ruling that insured's failure to disclose on the application that he had previously been refused insurance was material based on the insurer's uncontradicted testimony that the application would have been denied had the insured provided a truthful answer).

V.

Because we conclude as a matter of law that D&G made a material misrepresentation on its application for insurance, we reverse the district court's grant of summary judgment in favor of D&G and remand for further proceedings consistent with this opinion.[9]

REVERSED AND REMANDED

---

[9]D&G argues on appeal alternative equitable bases to sustain the district court's grant of summary judgment in its favor. The district court did not reach these alternative bases. We have reviewed D&G's alternative arguments and conclude that they do not entitle D&G to summary judgment.

HAMILTON, Senior Circuit Judge, dissenting:

The majority opinion tells us that the meaning of "professional liability claim" is clear and unambiguous. In my view, the meaning of "professional liability claim" is not so cut-and-dry. Because the term is ambiguous, it must be construed in favor of the insured, Draper & Goldberg (D&G). Construing the term in D&G's favor, Carolina Casualty Insurance Company (Carolina) is not entitled to rescind the policy. Accordingly, I dissent from the court's decision to reverse.

Question 16 asks, "Has any professional liability claim been made against the Applicant Firm, or any predecessor in business, or any of the past or present lawyers in the firm, during the past 5 years?" (J.A. 17). The parties concede that the application does not define the term "professional liability claim."

The standard to be applied here is not in dispute. Under Virginia law, we must give the words used in an insurance contract their ordinary and customary meaning. Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., 397 S.E.2d 876, 877 (Va. 1990).

The term "professional" is defined as "following an occupation as a means of livelihood." Random House Webster's College Dictionary 1056 (2000). There appears to be no dispute that the profession referred to in Question 16 is the practice of law by the lawyers of D&G. A "lawyer" is defined as a "person whose profession is to represent clients in a court of law or to advise or act for

21

them in other legal matters." Id. at 752. "Liability" is defined as the state of being "legally responsible." Id. at 765.

Because the term "lawyer" has traditionally been associated with the representation of clients, it certainly is reasonable to conclude that "profession," in the legal context, relates to the representation of clients, not nonclients. Thus, it follows that a reasonable construction of the term "professional liability claim" is a claim made by a client against the attorney who represented the client for damages or other relief arising from the representation. Cf. Ayyildiz v. Kidd, 266 S.E.2d 108, 112 (Va. 1980) (noting that an "attorney's liability for damages generally is only to his client following some dereliction of duty to the client"). Under this interpretation of "professional liability claim," D&G was not required to disclose the 500 lawsuits at issue. This is so because it is undisputed by all parties, including the majority, see ante at 4, that the 500 lawsuits at issue do not involve claims made by past or present clients of D&G.

That is not to say that the above interpretation, which was adopted by the district court, is the only reasonable interpretation of the term "professional liability claim." The majority itself provides such an interpretation. They conclude the "plain and ordinary meaning of the words 'professional liability claim' encompasses any type of claim attempting to assert liability against the applicant law firm arising out of its rendering of legal

22

services." Ante at 14-15. According to this definition, if the claim arose from the rendering of legal services, then the claim was required to be disclosed.

It is arguable that performing the duties of a successor trustee does not involve the rendering of legal services, as nonlawyers may be appointed successor trustees. Cf. Cohen v. Employers Reinsurance Corp., 503 N.Y.S.2d 33, 34-35 (1st Dep't 1986) (holding that, unless the policy specifically insures the attorney for liability arising out of an act or omission while serving as a trustee, such activities are not covered by a policy which limited coverage to claims arising out of the performance of professional services in the insured's capacity as a lawyer). However, it is plausible to interpret "professional liability claim" to include claims arising out of a lawyer's performance of successor trustee duties. Given such an interpretation, D&G would have been required to disclose the 500 lawsuits at issue in this dispute.

With two reasonable and logical interpretations of the term "professional liability claim," one in favor of coverage and one against, the term unquestionably is ambiguous. Indeed, the majority has not identified a single case which provides a definitive definition one way or the other. But, more importantly, even Carolina conceded below that the term was ambiguous. As the district court noted, Carolina conceded that the term was susceptible to more than one interpretation when it stated that the

23

"'five claims reported by D&G in response to Question 16 are not all classic "professional liability" claims as the term may be conservatively interpreted.'" (J.A. 461) (citation omitted); cf. Home Ins. Co. v. Law Offices of Jonathan DeYoung, P.C., 32 F. Supp. 2d 219, 230 (E.D. Pa. 1998) (noting that "Pennsylvania courts have found that where a professional liability insurance policy fails to define 'professional services,' as is the case here, the phrase standing alone can be deemed ambiguous, and therefore, must be construed against the insurer").

Under Virginia law, if a term in an insurance contract is ambiguous, "it will be construed against the insurance company and in favor of coverage." Andrews v. American Health and Life Ins. Co., 372 S.E.2d 399, 401 (Va. 1988). Applying this long-standing principle, it is evident that Carolina is not entitled to recission. Question 16 can be read to ask the law-firm applicant to disclose if any of their attorneys had claims made against them by a client for damages or other relief arising from the attorneys' or the firm's representation. As the record discloses no such claims, it cannot be said that D&G provided materially false information. Cf. id. at 402 ("Because we conclude that the phrase 'nervous disorder,' as used in this application, is ambiguous and could be read to refer to only physical disorders, we find that Ballenger did not answer question four untruthfully when he failed to disclose his periods of depression for which he sought medical attention.").

Citing <u>Andrews</u>, the majority states that Virginia's ambiguity rule of insurance contract construction applies only "when there is evidence that the ambiguity in the insurance application could have misled the applicant into providing false information." <u>Ante</u> at 16. From this premise, the majority concludes that Virginia's ambiguity rule does not apply here because D&G construed the term "professional liability claim" to include claims by nonclients. One searches in vain in <u>Andrews</u> and Virginia's ambiguity case law for the subjective intent limitation formulated by the majority. In fact, there is nothing extraordinary about Virginia's ambiguity rule. As noted above, under Virginia law, "[i]f the term is ambiguous, it will be construed against the insurance company and in favor of coverage." <u>Andrews</u>, 372 S.E.2d at 401. Moreover, we examine the language of an insurance contract from an objective, rather than a subjective, standpoint. <u>Cf.</u> <u>Dan River, Inc. v. Commercial Union Ins. Co.</u>, 317 S.E.2d 485, 487 (Va. 1984) (holding "[t]he interpretation of policy language" authorizing notice when considered appropriate "in the opinion of the insured" nevertheless "demands an objective determination" made "from an objective standpoint"). Thus, what D&G's principals allegedly understood or did not is of no moment. Rather, what is of consequence is the meaning of "professional liability claim" in the objective sense. Under Virginia law, the term is ambiguous and must be construed against Carolina and in favor of coverage.

25

It follows that I would affirm the well-reasoned opinion of the district court.