PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BP PRODUCTS NORTH AMERICA,
INCORPORATED,

*Plaintiff-Appellant,*

v.

CHARLES V. STANLEY, JR.;
TELEGRAPH PETROLEUM PROPERTIES,
LLC,

*Defendants-Appellees.*

No. 10-2097

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:09-cv-01147-LMB-TRJ)

Argued: October 26, 2011

Decided: February 14, 2012

Before TRAXLER, Chief Judge, and SHEDD and FLOYD,
Circuit Judges.

---

Reversed in part, vacated in part, and remanded by published
opinion. Chief Judge Traxler wrote the majority opinion, in
which Judge Shedd joined. Judge Floyd wrote a dissenting
opinion.

---

**COUNSEL**

**ARGUED:** John E. Petite, GREENSFELDER, HEMKER & GALE, PC, St. Louis, Missouri, for Appellant. John Edwin Coffey, REDMOND, PEYTON & BRASWELL, Alexandria, Virginia, for Appellees. **ON BRIEF:** Mark M. Hanna, MURPHY ANDERSON PLLC, Washington, D.C., for Appellant. Daniel D. Mauler, REDMOND, PEYTON & BRASWELL, Alexandria, Virginia; Harry Carl Storm, LERCH, EARLY & BREWER, CHARTERED, Bethesda, Maryland, for Appellees.

---

**OPINION**

TRAXLER, Chief Judge:

BP Products North America, Inc. ("BP") appeals a district court order granting summary judgment in favor of Charles V. Stanley, Jr., and his business, Telegraph Petroleum Properties, LLC ("Telegraph") (together, "Defendants") in BP's action seeking to enforce a restrictive covenant in a deed. BP also appeals the district court's award of attorneys' fees and costs. We reverse the grant of summary judgment, vacate the fee and cost award, and remand to the district court.

I.

BP is a petroleum refiner and distributor of motor fuel under the BP, Amoco, and Arco brands. Prior to December 2005, BP sold fuel directly to its lessees and station-owner retailers, who then resold the fuel to the public. Stanley was one of these lessees. For many years before December 2005, Stanley operated an Amoco-branded gasoline station in Alexandria, Virginia, on property leased from BP ("the Property"). During that time, in addition to selling BP fuel, Stanley operated an automobile repair shop on the Property.

In 2005, BP entered into an agreement to sell its Virginia, Maryland, and District of Columbia station properties and dealer fuel supply rights to Eastern Petroleum, an independent wholesale supplier, or "jobber." This agreement was subject to first providing individual retailers the chance to match Eastern's offer. The agreement was part of a transition by BP to a new distribution model, under which BP would no longer sell fuel directly to retailers such as Stanley. Rather, BP would sell to a large jobber, who would resell to BP-branded dealers under supply agreements the jobber had with the retailers. With its acquisition of BP's Virginia retail assets, Eastern entered into a 15-year supply agreement with BP, under which Eastern agreed to buy more than 100 million gallons of fuel annually from BP. Eastern also agreed to purchase each of the station properties subject to a restriction that they could not be used to sell non-BP-branded fuel.

BP offered Stanley and its other lessee-retailers the opportunity to match Eastern's offer to purchase the property they were leasing. The purchases would have to be subject to the restriction against using the property to sell non-BP-branded fuel, and the retailers would have to enter into 15-year supply agreements with Eastern. If the dealers decided not to purchase the properties, they could continue to operate their stations as they had been, with the only change being they would be leasing from Eastern rather than BP and buying fuel from Eastern rather than BP. The purpose of these dealings was to move BP to its new jobber distribution model, which required that demand for BP fuel at the station properties be maintained during the period under which Eastern's 15-year supply agreement with BP was in force.

Stanley, represented by legal counsel, agreed to purchase the Property pursuant to a Purchase and Sale Agreement ("PSA") with BP dated September 2, 2005. He also agreed to enter into a 15-year fuel-supply agreement with Eastern. Attached to the PSA was a Special Warranty Deed that

included restrictions on the Property's use. As is relevant here, one of these restrictions ("the PR") states:

> I.  ***Petroleum Restriction***: No part of the Property shall be used by Grantee or any other Grantee Party, directly or indirectly, for an automobile service station, petroleum station, gasoline station, or for the purpose of conducting or carrying on the business of selling, offering for sale, storage, handling, distributing or dealing in petroleum, gasoline, motor vehicle fuel, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils, or any fuel used for internal combustion engines, or lubricants in any form, or other petroleum or petroleum-related products, except for the personal use or consumption of such products by Grantee or its lessees of the Property, unless any such use is in connection with the operation of the Property as a Grantor branded service station. For purposes hereof, "Grantor branded service station" shall mean a service station under the brand BP, Amoco, Arco or any other brand of Grantor or any of its affiliates or their respective successors and assigns.
>
> The above covenants and use restrictions bind and restrict the Property as covenants and restrictions running with the land and each portion thereof, and are deemed to benefit Grantor as a user of, operator of, or supplier of Grantor branded fuels to lands or retail operations in the County in which the Property is located. These restrictive covenants will remain in full force and effect for a term of fifteen (15) years from the date of this conveyance whereupon these restrictive covenants will automatically lapse and terminate and be of no further force or effect.

J.A. 64, 468. Stanley expressly acknowledged that "the purchase price . . . reflects . . . the fact that all of the Use and

Operating Restrictions shall be recorded against the Property and shall be binding on Grantee and the other Grantee Parties." J.A. 462.

The deed took effect when the PSA was signed on December 5, 2005, and Telegraph signed a supply agreement with Eastern seven days later. By early 2006, however, Stanley had become concerned that Eastern was charging commercially unreasonable prices for its fuel. In response to a letter from Stanley on this subject, Eastern and Stanley both agreed to lower their profit margins in an attempt to make the sale of BP fuel at the station property viable. When this effort failed, Stanley requested that Eastern sell Telegraph a different, less expensive brand of fuel. Defendants apparently continued to purchase BP-branded fuel from Eastern until approximately July 2008.

Starting about July 2008, Telegraph did not sell any gasoline from the Property for one year but continued to provide vehicle-repair and inspection services on the Property. Defendants never requested any relief from the restrictive covenant to provide these services.

On April 27, 2009, Stanley sent BP a letter asserting that Eastern had materially breached the supply agreement by failing to offer commercially reasonable fuel prices. The letter stated that the PR was rendered unenforceable by the breach and informed BP that Stanley intended to remove his "Amoco brand imaging and obtain alternate gasoline supply." J.A. 181. Stanley also repeated this intent in a subsequent letter. Receiving no response, Defendants began selling AmeriGO fuel on July 24, 2009. When BP learned that Defendants were selling AmeriGO fuel, it demanded that they stop doing so.

Stanley refused, prompting BP to file suit against Defendants. BP's complaint alleges that Defendants violated the PSA and the Special Warranty Deed by selling non-BP branded motor fuel during the 15-year period in which the

restrictive covenant was in force. The complaint requests monetary damages, injunctive relief, and an award of attorney's fees and costs. Defendants counterclaimed, seeking a declaration that the deed restriction is overbroad and invalid ("Count I") and that BP violated § 2-305 of Virginia's commercial code by charging commercially unreasonable fuel prices ("Count II").

The parties filed cross-motions for summary judgment. In its motion, BP sought judgment on both its claims and Defendants' counterclaims. Defendants moved for summary judgment on BP's claims, but only on Count I of their counterclaims. BP also moved to strike a declaration in which Stanley proffered putative expert testimony on the commercial reasonableness of Eastern's fuel prices. The district court granted BP's motion to strike.

The district court subsequently granted Defendants' summary judgment motion and denied BP's, ruling that the PR was unenforceable as written and that it could not be modified by operation of the deed or by BP unilaterally. The court ruled that the PR was overbroad on the basis that it prohibited using the property as a vehicle repair business or using the property to sell kerosene, benzol, naphtha, greases, benzol, greases, or lubricating oils unless the station was BP-branded. The court did not reach Count II of Defendants' counterclaim, concluding that Count II sought the same relief that the court granted pursuant to Count I. The court also awarded $120,031.59 in fees and costs to Defendants.[1]

II.

BP argues that the district court erred in concluding that the PR was overbroad and, thus, unenforceable. We agree.

---

[1]The PSA provided for an award of attorneys' fees and costs to the prevailing party in any legal proceeding brought with respect to the agreement.

"Because we are sitting in diversity, our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." *Horace Mann Ins. Co. v. General Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008).

The parties agree that under Virginia law, covenants "restricting the free use of land are not favored and must be strictly construed." *Mid-State Equip. Co. v. Bell*, 225 S.E.2d 877, 884 (Va. 1976). They disagree, however, regarding the test by which such covenants should be judged. Defendants argue that the restriction should be judged by the standard discussed in *Omniplex World Services Corp. v. U.S. Investigations Services, Inc.*, 618 S.E.2d 340, 342 (Va. 2005), which applies to noncompete covenants in employment contracts. BP contends that restrictive covenants in deeds are judged by a different standard, namely the one discussed in *Merriman v. Cover, Drayton & Leonard*, 51 S.E. 817, 819 (Va. 1905), and that the *Omniplex* and *Merriman* tests are distinct from one another. We agree with BP.

Virginia courts have held that covenants restricting land use are valid "where the restraint is limited and there is a valuable consideration to support it," so long as "the restraint imposed is reasonable as between the parties and not injurious to the public by reason of its effect upon trade." *Merriman*, 51 S.E. at 819. A restraint is reasonable if it only "afford[s] a fair protection to the interests of the party in favor of whom it is given, and [is] not so large as to interfere with the interests of the public." *Id.* Virginia courts apply a different test to noncompete covenants in employment contracts, under which a covenant is enforced if it is "narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." *Omniplex*, 618 S.E.2d at 342; *see also Therapy Servs., Inc. v. Crystal City Nursing Ctr., Inc.*, 389 S.E.2d 710, 711 (Va. 1990) (applying *Merriman* test when "[a]lthough the provision in question involves an employee's

ability to secure future employment, it is neither a covenant not to compete nor a restrictive covenant between employer and employee"). The presence of the words "narrowly drawn" in the *Omniplex* test suggests that the *Omniplex* test is stricter. *See also* Ferdinand S. Tinio, Annotation, *Enforceability, insofar as restrictions would be reasonable, of contract containing unreasonable restrictions on competition*, 61 A.L.R.3d 397 § 2[a] ("Generally, a stricter test of reasonableness is applied in employment covenant cases than in sale covenant cases."). Additionally, *Omniplex*'s consideration of the "employee's ability to earn a living" is not even a part of the *Merriman* test. We therefore apply only the *Merriman* test to the facts before us.

In so doing, we note that courts have consistently upheld covenants similar to the one before us today. *See, e.g.*, *Savon Gas Stations No. Six, Inc. v. Shell Oil Co.*, 309 F.2d 306, 310-11 (4th Cir. 1962); *Eastling v. BP Prods. N. Am., Inc.*, 578 F.3d 831, 833 (8th Cir. 2009); *Calumet Council Bldg. Corp. v. Standard Oil Co. of Ind.*, 167 F.2d 539, 542 (7th Cir. 1948); *Staebler-Kempf Oil Co. v. Mac's Auto Mart, Inc.*, 45 N.W.2d 316, 319 (Mich. 1951). Additionally, Virginia courts often rely on *Restatements* in resolving issues of contract and property law, *see, e.g.*, *Edwards v. Bradley*, 315 S.E.2d 196, 198 (Va. 1984); *Meissel v. Finley*, 95 S.E.2d 186, 189 (Va. 1956), and the *Restatement (Third) of Property: Servitudes* (2000), addressing restrictions on the use of real property, strongly points to that result. Comment b to § 3.6 of the *Restatement* notes that "[t]he common law of unreasonable restraints on competition looks to the purpose, the geographic extent, and the duration of the restraint to determine whether it is reasonable." The comment also provides that "[c]ovenants against competition that are tied to ownership of a particular parcel of land are seldom unreasonable because the impact is limited to one piece of land." *Id.* Comment c to the same section further notes that "petroleum-product companies" often sell or lease "land for service stations, taking covenants from the grantees that they would purchase all their petroleum products from

the grantor and would sell only the grantor's products in the station." Comment c concludes that "[a]lthough there was some early hesitance about the validity of these arrangements, they came to be widely accepted."

Nevertheless, as we have explained, the district court found the PR to be overbroad and unenforceable for two reasons. BP challenges both reasons on appeal, and we will address them seriatim.

A.

First, BP argues that the district court erred in ruling that the PR is unenforceable because it purports to prohibit using the Property to operate a non-BP-branded auto repair shop that does not sell gasoline. Indeed, BP argues that the district court erred in interpreting the PR to even include such a prohibition. We agree.

Under Virginia law, terms in a contract will be interpreted in light of the context in which they appear. *See Westmoreland-LG & E Partners v. Virginia Elec. & Power Co.*, 486 S.E.2d 289, 294 (Va. 1997). As do the courts of other states, Virginia courts construe agreements "according to the sense and meaning of the terms which the parties have used; and, if they are clear and unambiguous, their terms are to be taken in their plain, ordinary and popular sense." *Bawden v. American Cent. Ins. Co.*, 150 S.E. 257, 260 (Va. 1929). Additionally, when "two constructions may be given a contract, one of which would render it valid and the other of which would destroy it, the former construction will be given it, if [it is] reasonable." *Merriman*, 51 S.E. at 818. Any ambiguity in a real covenant "must be resolved in favor of the unrestricted use of land." *Providence Square Assocs., L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000) (applying Virginia law).

The PR provides, in relevant part, that "[n]o part of the Property shall be used . . . for an automobile service station,

petroleum station, gasoline station, or for" other purposes not relevant to this issue "unless any such use is in connection with the operation of the Property as a [BP] branded service station." J.A. 64, 468. As BP's expert stated in his report,

> The terms automobile service station, petroleum station and gasoline station are common names referring to a retail facility that offers fuel and in some cases automotive repair services. . . . Depending on the context, "service station" or "automobile service station" could mean a retail facility that provides gas only, gasoline and convenience merchandise, gasoline and a car wash, gasoline and automotive repair services, or a combination of gasoline with any number of these goods or services.

> In the industry, however, "service station" or "automobile service station" would never mean a facility that provides automotive repair services only.

J.A. 406-07. This understanding is in line with the common meaning of "service station." *See Webster's Encyclopedic Unabridged Dictionary of the English Language* 1750 (2001) (noting that "service station" is a synonym of "gas station" and is defined as "a place equipped for servicing automobiles, as by selling gasoline and oil, making repairs, etc."). Thus, while a "service station" might offer auto-repair services, under the common meaning of the term, a service station would necessarily sell gasoline as well. Furthermore, the notion that "service station" and "gas station" are synonymous is hardly unlikely in light of the fact that the third term included in the list, "petroleum station," has the same meaning as well. *See Andrews v. American Health & Life Ins. Co.*, 372 S.E.2d 399, 401 (Va. 1988) (applying the maxim *noscitur a sociis*, which "instructs that 'the meaning of a word takes color and expression from the purport of the entire phrase of which it is a part, and it must be read in harmony with its context'").

Even if the meaning of "service station" were not plain outside the context of this agreement, it certainly is plain within the context of the agreement. The purpose of the PR from BP's perspective was "to secure [Stanley's] long term branded fuel sale commitment" by making sure that any gasoline sold on the property would be BP-branded. J.A. 416; *see* J.A. 418 ("The guaranteed length of the supply commitment is a critical element in determining the value of the location."). BP had no interest in prohibiting Stanley from operating an auto repair shop that did not sell fuel.

For all of these reasons, even assuming that the PR is ambiguous — and we do not believe that it is — the restriction must be interpreted narrowly to allow liberal use of the land, *see Providence Square Assocs.*, 211 F.3d at 850, and to favor the enforcement of the agreement, *see Merriman*, 51 S.E. at 818. *See also Bayside Corp. v. Virginia Super Food Fair Stores, Inc.*, 128 S.E.2d 263, 267 (Va. 1962) (explaining that courts should "give effect to the plain intention of the parties" who agree to accept certain restrictions "instead of seeking ingenious subtleties of interpretation by which to evade such restrictions" (internal quotation marks omitted)). Thus, we conclude that the PR does not prohibit Stanley from operating a non-BP-branded vehicle repair business on his property so long as the business does not also sell non-BP-branded gasoline.

### B.

BP next challenges the district court's conclusion that the PR is overbroad because it prohibits "the business of selling, offering for sale, storage, handling, distributing or dealing in . . . kerosene, benzol, naphtha, greases, lubricating oils . . . or lubricants in any form, or other petroleum or petroleum related products . . . unless any such use is in connection with the operation of the Property as a Grantor branded service station." J.A. 64, 468. The district court determined that the evidence showed "that BP has no interest in the sale or use of

these items." J.A. 989. On this basis, the district court determined that the restriction was unreasonable as between the parties. The court also reasoned that "because of the covenant's overbreadth, it clearly injures the public because its language chills, and in fact, in this case, entirely halts, the competitive sale of goods to the public." J.A. 990.

BP advances multiple arguments challenging the ruling by the district court that the PR was overbroad as a result of its application to the sale of these enumerated items. BP first argues that, as a petroleum refiner, it has a legitimate business interest in prohibiting the sale of any products that would dilute the demand for BP's petroleum. BP also maintains that the PR should be read to prohibit the sale of kerosene, benzol, or naphtha only to the extent those products are used for the sale of fuel for internal combustion engines. Finally, BP argues that it is not seeking to prevent the sale of lubricants and that any prohibition of such sales "is academic and represents far too slender a reed on which to invalidate the entire Petroleum Restriction, and thereby allow Stanley to use the Property to sell non-BP fuel, the very use the parties indisputably intended that the Property could not be put." Appellant's brief at 48.

We agree with BP that the challenged prohibition at the outset is too inconsequential to invalidate the entire PR. The PR clearly exists to prohibit primarily the operation of a non-BP-branded gas station. No evidence suggests that Stanley's right to sell any of the products in the prohibition at issue is of significant importance to him or to BP. More to the point, no evidence suggests that prohibiting their sale on this one particular piece of property has any effect whatsoever on the public interest. *See Bayside Corp.*, 128 S.E.2d at 266 (holding that restriction "clearly . . . d[id] not interfere with the rights of the public" when "[i]t only prohibit[ed] a super market in one shopping center"). Indeed, the only effect that the prohibition appears to have had is that it has served as a basis for Defendants' attempt to invalidate the portions of the restric-

tions that actually do affect the parties.[2] We need go no further in our analysis than to note how unimportant this argument is.

We therefore conclude that the PR, although perhaps slightly broader than necessary to achieve its purpose, on the whole "afford[s] a fair protection" to BP's interests without being "so large as to interfere with the interests of the public." *Merriman*, 51 S.E. at 819. Accordingly, we hold that the district court erred in granting summary judgment against BP. Because we reverse the judgment, we also vacate the fee and cost award.[3]

## III.

For the foregoing reasons, we reverse the district court's grant of summary judgment to the Defendants, vacate the fee

---

[2]We note that Defendants claim that the equities in this case favor invalidation because BP made clear to Stanley that the terms upon which it would sell the property were nonnegotiable. However, it is hard to see how BP's refusal to offer the property to Stanley under more generous terms than those to which Eastern had already agreed is unfair to Stanley. Stanley was perfectly free to reject BP's offer and essentially continue on as he had before, leasing the property rather than owning it; but having chosen to accept BP's terms, the existence of which was reflected in the price paid for the property, Stanley is not free to avoid them. *See Bayside Corp. v. Virginia Super Food Fair Stores, Inc.*, 128 S.E.2d 263, 266-67 (Va. 1962) ("It may not be amiss to here suggest that there can be no sound or wholesome public policy, which operates in the slightest degree to lend approval to open disregard and violation of personal contracts entered into in good faith, upon good consideration. It is quite as important as a matter of public interest and welfare, that individuals be not allowed, with impunity, to transgress their solemn undertakings, advisedly entered upon, as it is that the public have protection in other respects." (internal quotation marks omitted)).

[3]After oral argument, BP requested that we take judicial notice of, or supplement the record on appeal with, an instrument of partial release that BP maintains it recorded with the Fairfax County Recorder of Deeds. In light of our disposition of BP's appeal, we deny BP's request as moot.

and cost award, and remand for further proceedings consistent with this opinion.

*REVERSED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

FLOYD, Circuit Judge, dissenting:

The majority notes that the Petroleum Restriction (PR) is "slightly broader than necessary to achieve its purpose." *Ante* at 13. Nevertheless, it concludes that the PR remains enforceable because it "on the whole 'afford[s] a fair protection' to BP's interests without being 'so large as to interfere with the interests of the public.'" *Id.* (quoting *Merriman v. Cover, Drayton & Leonard*, 51 S.E. 817, 819 (Va. 1905)). I cannot agree and therefore respectfully dissent.

Virginia law allows a restraint on trade only when it is "reasonable as between the parties and not injurious to the public by reason of its effect upon trade." *Merriman*, 51 S.E. at 819. "Whether or not the restraint is reasonable is to be determined by considering whether it is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public." *Id.*

Here, the PR, which BP drafted and to which Stanley agreed, prohibits Stanley from

> carrying on the business of selling, offering for sale, storage, handling, distributing or dealing in petroleum, gasoline, motor vehicle fuel, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils, or any fuel used for internal combustion engines, or lubricants in any form, or other petroleum or petroleum-related products, . . . unless any such use

> is in connection with the operation of the Property as a Grantor branded service station.

BP admits, however, that it does not sell automotive lubricants to the general public; supply naphtha, benzol, kerosene, greases, or lubricating oils to any service station in Virginia; compete in the automotive lubricant industry; or receive any revenue from the sale of automotive lubricants anywhere within Virginia. In my mind, therefore, BP drafted a covenant that regulates more than is necessary to protect its legitimate interests, and simply put, the PR is overbroad.

BP argues, of course, that the PR is not overbroad. Citing dictionary definitions that indicate kerosene, naphtha, and motor oil are petroleum-related, it asserts that it has a legitimate interest in prohibiting the sale of any product that would "dilute the demand for [its] petroleum," even if it does not sell that particular product in Virginia. Notably, however, BP does not argue that it has a legitimate business interest in prohibiting the storage or handling of such products or in regulating the presence and use of "greases," "lubricating oils," and "lubricants in any form," even though the PR specifically addresses this conduct. Instead, it asks us to ignore the PR's plain language and "construe[ ]" its overbroad prohibitions "in light of the [PR's] purpose and aims"—namely, "to prevent the sale of products that dilute the demand for BP gasoline." "If a certain petroleum product does not have that capacity," BP argues, "its sale would *not* be prohibited." In sum, then, BP asks us (and Stanley) to determine if a prohibited product would "dilute the demand for BP gasoline" and, if not, simply pretend that the plain language of the PR does not truly prohibit the sale, storage, or use of that product. This I cannot do. BP is a sophisticated, experienced, and competently represented party. Accordingly, I must assume that it drafted the PR's language carefully and intentionally, and I cannot view

its sweeping prohibitions as a casual mistake or oversight.* *See Richfood, Inc. v. Jennings*, 499 S.E.2d 272, 276 (Va. 1998) ("No word or clause will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words aimlessly." (quoting *Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984)) (internal quotation marks omitted)).

BP contends that we can enforce the PR regardless of any overbreadth simply by excising the offending language. And, since oral argument, BP purportedly has released Stanley from the overbroad portions of the PR. *See Ante* at 13 n.3. Nevertheless, I cannot conclude that the PR becomes enforceable through alteration by the court or BP. First, Virginia law disfavors judicial reformation of covenants through blue-penciling. *See Strategic Enter. Solutions, Inc. v. Ikuma*, No. CL 2008-8153, 2008 WL 8201356, at *4 (Va. Cir. Ct. Oct. 7, 2008) ("The Virginia Supreme Court has not directly ruled on 'blue-penciling' overly broad clauses in restrictive covenants[;] however it is clear from the restrictive covenant jurisprudence in Virginia that the Court does not entertain the notion that these disfavored restraints on trade should be reformed by the judiciary . . . ."); *Daston Corp. v. MiCore Solutions, Inc.*, No. CL-2010-9318, 2010 WL 7375597, at *5 (Va. Cir. Ct. July 30, 2010); *Better Living Components, Inc. v. Coleman*, No. CH04-13,307, 2005 WL 771592, at *5 (Va. Cir. Ct. Apr. 6, 2005). More fundamentally, however, Virginia law supports narrowly drawn covenants that are reasonable, and general public policy encourages parties to draft precise language on which all participants to a contract can

---

*The district court aptly noted that the PR "is literally so broad that it would prohibit Stanley from operating a restaurant on the property, if it used kerosene to heat the stove, or a bicycle repair shop if petroleum-based lubricants were used." *BP Prods. N. Am., Inc. v. Stanley*, No. 1:09cv1147, 2010 WL 2817238, at *4 n.6 (E.D. Va. July 15, 2010). Furthermore, I cannot comprehend how Stanley could successfully or efficiently operate an automotive repair business without the ability to store or handle greases or "lubricants in any form."

rely. Allowing BP, a multinational, sophisticated corporation, to draft blatantly overbroad restrictions and then, when challenged, simply declare that such restrictions are a mistake and meaningless not only is contrary to basic contract principles, but also is detrimental to the public interest. Accordingly, I find that the PR's overbreadth spoils its enforceability and dissent from the majority's contrary conclusion.